Bernard J. MORTISE and Cheryl
L. Mortise, Appellants,

v.

UNITED STATES of America, Appellee.

Nos. 86, 87, Dockets 96–6046, 96–6048.

United States Court of Appeals,
Second Circuit.

Argued Sept. 4, 1996.

Decided Dec. 24, 1996.

Paul L. Pileckas, Rome, NY, for Appellants.

William F. Larkin, Assistant United States Attorney, Northern District of New York, Syracuse, NY, for Appellee.

Before: FEINBERG, CARDAMONE, and McLAUGHLIN, Circuit Judges.

McLAUGHLIN, Circuit Judge:

## BACKGROUND

On a Saturday night in early March, 1991, Bernard and Cheryl Mortise and their friends, the Wagners, were riding on All Terrain Vehicles (ATV's) in upstate New York on land owned by Oneida County (the "County"). ATV's are three or four wheel motorized recreational vehicles somewhat akin to motorcycles. The Mortises had their own ATV's, as did each of the Wagners.

They sported on logging roads near Route 49 close to the town of New London. The Mortises had made similar trips in the past; as before, the Mortises did not notice any signs or fences restricting the use of the land. On the fateful Saturday evening, unbeknownst to the Mortises, the County had given the 108th Infantry Regiment of the Army National Guard permission to use the same land for training exercises.

Three years earlier, in 1988, the County had entered into an agreement with 108th Infantry Regiment regarding the use of the land near New London. Under the Agreement, the National Guard would "on occasion" use the land for overnight field training exercises. The National Guard advised the County that blank ammunition and smoke would be used during some training exercises. The National Guard, for its part, had agreed that the United States would be responsible for any damage, injury or death caused by the National Guard during these exercises.

### A. The Mishap

Near dusk, the Mortises and the Wagners travelled into the woods on the logging road. They had been driving on this particular land for a number of years, and noticed only the occasional hiker or ATV. This Saturday evening, however, Mrs. Mortise spied shadows in the woods, but thought nothing of it. The four continued up the wooded trail.

The Mortises did not realize that those shadows were cast by members of the 108th infantry Regiment. The Guardsmen were engaged in mock "wargames," setting up mortar placements, and roaming the woods, armed with M–16 assault rifles, .9 millimeter semi-automatic pistols, and 81 millimeter mortars. As is common in such exercises, Guardsmen had placed trip wires near mortar placements. When faux "enemies" approached mortar placements they would trigger the tripwires, setting off smoke flares, and revealing the "enemy" position.

Lieutenant Thomas Hanley, the mortar platoon leader, saw the four ATV's travel into the woods on the logging road. He did not, however, try to stop them, or inform his men to take precautions because he assumed that other Guardsmen saw the ATV's as well. The Mortises had passed within a few yards of a mortar position. After the group went up the trail, a Guardsman rigged a tripwire across the road behind the ATV's, and attached it to a flare.

Around 9:30 P.M., the Mortises and their friends were returning from the woods, driving back down the logging road, single file. Mr. Mortise was in the lead, his wife was about 50 feet behind him, and the Wagners behind her. Mr. Mortise tripped the wire, igniting a flare that spewed debris over him and his vehicle. Instantly, Guardsmen in

camouflage uniforms roared out of the woods. The Guardsmen pointed their rifles at Mr. Mortise's head, and "dry-fired" (i.e., no bullets) the triggers. Mr. Mortise pleaded with them not to shoot. The Guardsmen told Mr. Mortise to "shut up" and to shut off his ATV. One of the Guardsmen actually fired a blank round.

Mrs. Mortise saw the explosion, the Guardsmen raising their guns to her husband, and she heard the blank shot fired. She thought her husband had been shot and began to scream. A Guardsman told her to shut up. Moments later, Mr. Mortise approached her and told her to calm down. She wanted to run away, but Mr. Mortise told her not to because there were "too many of them." The Guardsmen, convinced that the four ATV'ers were enemy decoys in the wargame, treated the Mortises brusquely, cursing, and telling them that they were "prisoners."

Lt. Hanley soon arrived on the scene. He told the Mortises that they had stumbled into a National Guard training exercise, and that their capture had been a misunderstanding. He tried to explain the Guardsmen's confusion. After a brief conversation, the Mortises and their friends were allowed to leave, shaken by the outrageous conduct of the National Guard.

Mrs. Mortise subsequently entered the care of a psychologist. She has nightmares, and harbors fears of going out at night, of people in uniforms, and of shopping by herself.

### B. *The Mortises' Lawsuits*

In December 1993, Mr. and Mrs. Mortise each filed individual lawsuits against the United States in the United States District Court for the Northern District of New York. (Hurd, *Magistrate Judge*) In their complaints, the Mortises alleged that the negligence of the National Guardsmen caused them "mental and emotional injuries." With the consent of the parties, the case was referred to Magistrate Judge David Hurd. The government filed a motion for summary judgment, arguing that because the Mortises claims arose out of an assault—a tort for which the government has not waived sovereign immunity—the court lacked subject matter jurisdiction.

The Magistrate granted the government's motion, reasoning that a claim for intentional infliction of emotional distress (which plaintiffs never asserted in the district court) was "the same" as a claim for an assault from which the government is immune, and that the Mortises' claim for negligent infliction of emotional distress failed to state a claim under New York law.

The Mortises now appeal, arguing that summary judgment was improper because there is a question as to whether there was a duty owed by the government to the Mortises as third-party beneficiaries of the contract between the National Guard and Oneida County. They also claim that there is a question of fact as to whether the Guardsmen's conduct was an assault, negligent infliction of emotional distress, or a combination of the two.

### DISCUSSION

We review *de novo* a district court's grant of summary judgment. *Williams v. Greifinger*, 97 F.3d 699, 702 (2d Cir.1996) (citation omitted). Summary judgment is appropriate when, viewing all the evidence in a light most favorable to the nonmoving party, there is no genuine issue of material fact. *Buttry v. General Signal Corp.*, 68 F.3d 1488, 1492 (2d Cir.1995); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

The Mortises argue that there are jury questions whether the National Guardsmen's conduct constitutes assault or negligent infliction of emotional distress. We conclude that there is no legal basis either for a claim of assault or for a claim of negligent infliction of emotional distress. Because there is nothing for a jury's consideration, summary judgment was proper.

### A. *Immunity*

In the formative years of our country, Chief Justice Marshall declared that "[t]he universally received opinion is, that no suit can be commenced or prosecuted against the

United States." *Cohens v. Virginia*, 19 U.S. [6 Wheat.] 264, 411–412, 5 L.Ed. 257 (1821). Sixty years later the Supreme Court retreated from absolute immunity to the more defensible position that the "United States cannot be lawfully sued without its consent in any case." *United States v. Lee*, 106 U.S. 196, 204, 1 S.Ct. 240, 247, 27 L.Ed. 171 (1882). Thus, "sovereign immunity" protects the United States from suit unless Congress specifically abrogates that immunity by statute. *See, e.g., Finn v. United States*, 123 U.S. 227, 233, 8 S.Ct. 82, 85, 31 L.Ed. 128 (1887); *United States v. Shaw*, 309 U.S. 495, 504, 60 S.Ct. 659, 662–63, 84 L.Ed. 888 (1940).

■ Under the Federal Tort Claims Act ("FTCA"), the government has waived its sovereign immunity for a number of torts. 28 U.S.C. § 2671 *et seq.* Section 2680 of the FTCA, however, expressly refuses to waive sovereign immunity for any claims arising out of assault or battery. 28 U.S.C. § 2680(h). In short, any claim the Mortises have against the government for assault is barred for lack of jurisdiction.

### B. *Intentional Infliction of Emotional Distress*

The government spills much ink trying to persuade us that the Mortises' claim for intentional infliction of emotional distress has no merit. The effort, however, is feckless because the Mortises never made such a claim before the district court. It appears nowhere in the appellants' pleadings or their briefs. At oral argument, the Mortises' attorney specifically stated that the Mortises make no claim for intentional infliction of emotional distress. Hence, we will consider it no further.

### C. *Negligent Infliction of Emotional Distress*

The Mortises concentrate most of their effort arguing that there are jury questions regarding their claim for negligent infliction of emotional distress. We rule, as a matter of law, that the Mortises have no claim for negligent infliction of emotional distress.

■ The liability of the federal government under the FTCA is generally determined by state law. *See* 28 U.S.C. § 2674; *Metzen v. United States*, 19 F.3d 795, 807 (2d Cir.1994). Hence, we look to New York tort principles to determine the Mortises' claim for relief on a theory of negligent infliction of emotional distress under the FTCA.

■ Under New York law, a plaintiff may establish such a claim in one of two ways: (1) the "bystander" theory; or (2) the "direct duty theory."

■ A plaintiff may recover for a purely emotional injury under the "bystander" theory when: (1) she is threatened with physical harm as a result of defendant's negligence; and (2) consequently she suffers emotional injury from witnessing the death or serious bodily injury of a member of her immediate family. *See Bovsun v. Sanperi*, 61 N.Y.2d 219, 230–31, 473 N.Y.S.2d 357, 461 N.E.2d 843 (1984). Logically, Mrs. Mortise is the only one who could conceivably recover under a "bystander" theory, because she witnessed the bizarre attack on her husband. Mrs. Mortise's claim, however, is fatally deficient both because her own physical safety was never threatened and she did not see Mr. Mortise suffer a serious physical injury.

■ Under the "direct duty" theory a plaintiff has a cause of action for negligent infliction of emotional distress if she suffers an emotional injury from defendant's breach of a duty which unreasonably endangered her own physical safety. *Kennedy v. McKesson Co.*, 58 N.Y.2d 500, 504, 462 N.Y.S.2d 421, 448 N.E.2d 1332 (1983); *Green v. Leibowitz*, 118 A.D.2d 756, 500 N.Y.S.2d 146, 148 (N.Y.App.Div.1986). The duty in such cases must be specific to the plaintiff, and not some amorphous, free-floating duty to society. *See Johnson v. Jamaica Hosp.*, 62 N.Y.2d 523, 526–27, 478 N.Y.S.2d 838, 467 N.E.2d 502 (1984). Neither of the Mortises has a cause of action under a direct duty theory. While the Guardsmen may have had a generalized duty to prevent unreasonable risks of harm to passers-by, this duty was not specific to the Mortises.

■ To establish that there was a specific, unique duty owed to them, the Mortises

maintain that they were third-party beneficiaries of the contract between Oneida County and the federal government. This argument smells of the lamp since it surfaces for the first time on appeal. The Mortises did not raise this third party beneficiary theory before the district court. We generally do not consider an argument for the first time on appeal unless to do otherwise would create manifest injustice. *See Greene v. United States*, 13 F.3d 577, 586 (2d Cir.1994).

 In any event, the third party beneficiary theory is meritless. Generally, only an intended beneficiary of a contract may assert a claim as a third-party beneficiary. *Cahill v. Lazarski*, 641 N.Y.S.2d 124, 125 (N.Y.App. Div.1996). There is no indication that the agreement between the federal government and Oneida County was intended to confer a benefit on the Mortises. Indeed, there is no evidence that the government or the County even knew of their existence. The purpose of the contract was to release the County from liability for the actions of the Guardsmen. The agreement conferred no benefit on any entity other than the County. Any protection for passers-by, such as the Mortises, lay in general tort principles, not the contract.

### CONCLUSION

Although the conduct of the National Guard was, as already indicated, outrageous, the law requires us to affirm the district court's grant of the government's motion for summary judgment.