Ricky **BROWN**, Jamel Champen, Sheryl Champen, Hopeton Gordon, Jean Cantave, Raishawn Morris, Tim Richardson, Darryl Taylor, Robert Walker, Clement Mallory, Ronald Sanchez, Darnell Lemons, John Butler, Michael Christian, King Gonzalez, Jason Childs, Paul Heyward, Jr., Ronald Jennings, Paul Howe, Bubu Demasio, Wilson Acosta, Chris Holland, Jermaine Adams, Felix Francis, Daniel Sontag, Ronald Lynch, Kenneth McClain, Hervey Pierre, Vincent Quinones, Laurence Plaskett, Lamont Wyche, Steven York, Tyrone Lohr, Major Barnett, Charles Battiste, Kevin Allen and Wayne Lewis, on behalf of themselves and all other persons similarly situated, Plaintiffs–Appellees,

v.

CITY OF ONEONTA, NEW YORK, POLICE DEPARTMENT, of the City of Oneonta, New York, John J. Donadio, Chief of Police of the City of Oneonta, in his individual and official capacities, William M. Davis, Oneonta Police Officer, in his individual and official capacities, Anonymous Officers, and Investigators of the Police Department of the City of Oneonta, in their individual and official capacities, H. Karl Chandler, New York State Police Investigator, in his individual and official capacities, Robert Farrand, New York State Police Troop C Commander, in his individual

---

1126

and official capacities, George Clum, New York State Police Investigator, in his individual and official capacities, Kevin More, New York State Police Investigator, in his individual and official capacities, John Way, New York State Police Investigator, in his official capacities, Mark Kimball, New York State Trooper, in his individual and official capacities, Kenneth Grant, New York State Trooper, in his individual and official capacities, NYS Trooper Farrago, in his individual and official capacities, Merritt Hunt, SUCO Department of Public Safety Officer, in his individual and official capacities, Tim Jackson, SUCO Department of Public Safety Officer, in his individual and official capacities, Leif S. Hartmark, in his individual and official capacities, Eric Wilson, in his individual and official capacities, Carl Shedlock, in his individual and official capacities, State University of New York, State University of New York College at Oneonta ("SUCO"), Defendants–Appellants,

Joseph Redmond, Oneonta Police Officer, in his individual and official capacities, X. Olsen, Oneonta Police Officer, in his individual and official capacities, State of NY, NYS Division of State Police, Anonymous State Police Officials & Investigators, in their individual and official capacities, SUCO Department of Public Safety, John Edmondson, SUCO Department of Public Safety Officer, in his individual and official capacities, Anonymous Public Safety Officers, in their individual and official capacities, Anonymous SUCO Computer Employees, in their individual and official capacities, Defendants.

Nos. 232, 3, 2, 543, 545, 544 and 546, Dockets 94–7191, 94–7233, 94–7287, 96–7140, 96–7141, 96–7145 and 96–7305.

United States Court of Appeals, Second Circuit.

Argued Nov. 22, 1996.

Decided Feb. 14, 1997.

Denise A. Hartman, Assistant Attorney General, State of New York (Dennis C. Vacco, Attorney General of the State of New York, Victoria A. Graffeo, Solicitor General, Peter H. Schiff, Deputy Solicitor General, Nancy A. Spiegel, Assistant Attorney General, Albany, NY, of counsel), for State Defendants–Appellants.

Brian J. O'Donnell, Albany, NY (Richard W. Bader, Rowley, Forrest, O'Donnell, Beaumont & Pelersi, P.C., Albany, NY, of counsel), for Defendant–Appellant Leif S. Hartmark.

Daniel J. Stewart, Dreyer Boyajian, L.L.P., Albany, NY, for City Defendants–Appellants.

D. Scott Bassinson, Whiteman Osterman & Hanna, Albany, NY, for Plaintiffs–Appellees.

Before: WALKER and LEVAL, Circuit Judges, and STANTON, Senior District Judge.*

STANTON, Senior District Judge:

On September 4, 1992, employees of the State University of New York College at Oneonta ("SUCO") released a list of the names and addresses of SUCO's black male students to law enforcement officers who were looking for an armed young black male suspect in a violent crime. The main issue on this appeal is whether those students had a clearly established right under the Family Educational Rights and Privacy Act of 1974 ("FERPA"), 20 U.S.C. § 1232g, not to have that list released. In their class action for damages and injunctive relief, the district court (McAvoy, *Chief Judge* ) denied defen-

* Of the United States District Court for the South-ern District of New York, sitting by designation.

dants' motion for summary judgment granting them qualified immunity and dismissing claims that they violated FERPA. The district court stated that "it's not clear that this release [of the list] fell within one of the narrow exceptions of FERPA."

We hold that because it was unclear whether FERPA's "emergency exception" allowed release of the list, no clearly established right of plaintiffs was infringed and appellants are entitled to qualified immunity from claims of conspiracy and release and use of the list in violation of FERPA.

Other defendants-appellants argue that the district court should have granted summary judgment dismissing certain Fourth Amendment claims against them. On some of those claims, we understand the district court to have granted their motion for summary judgment, and accordingly dismiss those appeals. On the other claims, the district court did not determine that they were not entitled to summary judgment, but treated their motion as one to dismiss under Federal Rule of Civil Procedure 12(b)(6). We remand to the district court for consideration of their defense of qualified immunity.

## BACKGROUND

Sometime between midnight and 2:00 a.m. on Friday, September 4, 1992, a knife-wielding man entered the bedroom of a house just outside the city limits of Oneonta, New York, and attacked an elderly woman who was staying there as a guest. Both the assailant and victim were cut with the knife during the attack. When the police arrived at the scene, the victim advised them that she believed her assailant was black, based on what she saw of his hand or lower forearm. She also said she thought her assailant was young because she heard him run quickly across the room. The police canine unit tracked the assailant from the scene of the crime in the direction of the SUCO campus, but lost the scent. Sergeant Shedlock of the Oneonta Police then informed Lieutenant Merritt Hunt of the SUCO public safety office that "the perpetrator's trail led to a wooded area .... at the base of the Oneonta campus." (R. at 223.) At Hunt's request, John Edmondson, the director of SUCO's public safety office, called Eric Wilson, the director of SUCO's computer department, and told him that the perpetrator's trail had led to the edge of the campus and that the police had requested a list of black male students. Wilson made a list of the names and addresses of all black male SUCO students. His affidavit states what happened next:

4. That afternoon, I met with my supervisor, Leif Hartmark, who was Vice President for Administration, to advise him of the sensitivity of the request so that someone of proper authority could make a determination as to whether the list should be provided to the police. Dr. Hartmark advised me during our meeting that since the President was recuperating from surgery and the Vice President for Academic Affairs was out of town, he was the officer in charge and had to make the decision as to whether to release the list.

5. I advised Dr. Hartmark that, based on the information provided to me, the perpetrator had a knife and might be a danger to the campus, since it appeared that the police thought he might be a student or might be hiding on campus. We discussed the possibility that if we did not release the list, we would be putting our students in possible jeopardy since a dangerous felon could be in the dormitories or elsewhere on campus.

6. I told Dr. Hartmark that I didn't know for certain whether it was legal to release the list, but that it seemed reasonable and appropriate to create the list and release it to the law enforcement authorities in order to assist them. The information requested appeared to be important and necessary to the conduct of a lawful criminal investigation. In addition, I expressed concern about the safety of our students.

7. We also discussed the length of time the police had been waiting for the list, and that time was of the essence in providing this information to them given the nature of the crime, as well as the fact that the Labor Day weekend was about to begin, making it difficult to reach others in a timely manner.

8. After this discussion, Dr. Hartmark authorized me to provide the list to the

College's Department of Public Safety. I then personally delivered the list to the Public Safety Office.

9. The Computer Center does not maintain lists of students by race or sex. The list of black male students which I provided to the Public Safety Office was created from information stored in the College's computer data base and was created solely at the request of the police and for the purpose of assisting in a law enforcement investigation.

(R. at 226–27.)

SUCO's public safety office released the list to the police. From the list, the state police created "lead sheets," which were distributed to state and city police officers who used them to locate the listed students, whom they questioned.

Several police officers also conducted a "sweep" of Oneonta during the next several days, stopping and questioning non-white persons. No suspect was apprehended.

This action was brought in 1993 by students whose names were on the list SUCO had released and by non-white persons questioned by police officers during the sweep of Oneonta. The students claimed that Hartmark, Wilson, and unnamed employees in SUCO's computer department violated FERPA by releasing the list, and that Hartmark, Wilson, and others had conspired to violate FERPA in violation of 42 U.S.C. §§ 1983 & 1985(3), and had failed to prevent the § 1985(3) conspiracy in violation of 42 U.S.C. § 1986. They also asserted numerous other claims under state and federal law against defendants including (1) Dr. Leif Hartmark, (2) SUCO, Eric Wilson, various other SUCO officials, the State of New York Division of State Police, and various state police officers (collectively "the state defendants"), and (3) the City of Oneonta Police Department and various officers in that department (collectively "the city defendants").

The defendants asserted the defense of qualified immunity, arguing that it was not clearly established that the release of the list was not permitted by FERPA's "emergency exception," which allows release of informa-

tion to appropriate persons to protect health or safety in an emergency.

The district court refused to grant any defendant immunity from the FERPA-related claims, stating, "Because it's not clear that this release fell within one of the narrow exceptions of FERPA, the reasonable state college official should have known that such release would violate the rights of students attending the school." (R. at 337.)

On applications for reconsideration, the district court adhered to its original determination, stating:

> To show that the defendants are entitled to qualified immunity in this situation, they would have to show that based upon their knowledge at the time of the incident, it was reasonable to assume that an emergency situation existed which was sufficient to overcome FERPA's prohibition on the release of non-directory information in light of the fact that the emergency exception is to be "strictly construed." 33 CFR § 99.36(b).

> The court finds that the defendants have not met this burden of proof and that a reasonable college official, construing FERPA's emergency exception narrowly, as required by law, would have refused to release the list. . . . Based on the facts established thus far in the case, it is not clear that FERPA's emergency exception can be easily read to cover this situation. . . . It is exactly that issue which must be decided by the jury. . . . To hold otherwise would ultimately allow qualified immunity to bar a FERPA claim from reaching the jury any time a question of fact remained as to the existence of an emergency.

(R. at 430–31.) Defendants' appeals were withdrawn without prejudice to renewal after further proceedings in the district court.

Plaintiffs filed a second amended complaint, adding nonstudent plaintiffs who alleged that their Fourth Amendment rights had been violated by police officers during the sweep of Oneonta. The student-plaintiffs renewed their earlier claims, and defendants' renewed motions for dismissal or summary judgment were again denied.

However, the district court dismissed, or granted summary judgment dismissing, many of the newly-added plaintiffs' Fourth Amendment claims, except for those asserted by Vincent Quinones, Laurence Plaskett, and Ronald Jennings against certain defendants. Three city police officers appeal from the refusal to dismiss those plaintiffs' claims against them.

Dr. Hartmark and the state and city defendants renew their appeals.

## DISCUSSION

Defendants-appellants argue that the district court should have granted them qualified immunity from claims that (1) Hartmark, Wilson, and other SUCO employees violated FERPA, (2) Hartmark, Wilson, and others conspired to violate FERPA and failed to prevent that conspiracy, and (3) Oneonta police officers John Donadio, William Davis, and Carl Shedlock violated the Fourth Amendment rights of Vincent Quinones, Laurence Plaskett, and Ronald Jennings.

### I. FERPA Claims and Qualified Immunity

#### A. Jurisdiction

We have jurisdiction of these interlocutory appeals asserting an erroneous denial of qualified immunity. As stated in *Salim v. Proulx,* 93 F.3d 86 (2d Cir.1996),

as long as the defendant can support an immunity defense on stipulated facts, facts accepted for purposes of the appeal, or the plaintiff's version of the facts that the district judge deemed available for jury resolution, an interlocutory appeal is available to assert that an immunity defense is established as a matter of law.

93 F.3d at 90.

The issue in the district court was not over what the facts were, but whether they could reasonably be viewed as an "emergency" under FERPA. As the district court treated it:

It's not clear to this Court that the situation surrounding the release of the list of black students rose to a level which could automatically be considered an emergency. However, it is equally unclear that the situation did not constitute an emergency. Thus, this question must be submitted to a jury and summary judgment motions by the Defendant Hartmark and plaintiffs are denied.

(R. at 344–45.)

#### B. Standard of Review

As we recently stated in *Mortise v. United States,* 102 F.3d 693 (2d Cir.1996):

Summary judgment is appropriate when, viewing all the evidence in a light most favorable to the non-moving party, there is no genuine issue of material fact. *Buttry v. General Signal Corp.,* 68 F.3d 1488, 1492 (2d Cir.1995); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

*Mortise,* 102 F.3d at 695. We review *de novo* the district court's determinations of law. *Richmond Boro Gun Club, Inc. v. City of New York,* 97 F.3d 681, 684 (2d Cir.1996).

#### 1. FERPA-violation claims

The evidence before the district court established the following basic facts. On the morning of September 4, 1992, the police were looking for a black male suspect who had entered a house in the vicinity of Oneonta early that morning, attacked a person in the house with a knife, and then escaped. Carl Shedlock, a City of Oneonta police officer, called Merritt Hunt, an officer in SUCO's public safety office, informed him that the attacker's trail led toward the campus, and requested assistance. Hunt spoke to John Edmondson, the director of the public safety office. Edmondson called Eric Wilson, director of SUCO's computer center, and asked whether Wilson could create a list of SUCO's black male students. Wilson later discussed the situation with Dr. Hartmark and told him the police thought the perpetrator might be a student or be hiding on campus, and Hartmark approved the release of the list.

 Public officials are entitled to qualified immunity from claims for damages if (1) their conduct did not violate federal statutory or constitutional rights that were clearly established at the time, or (2) it was objectively reasonable for them to believe their acts did

not violate those rights. *See Weyant v. Okst,* 101 F.3d 845, 857–58 (2d Cir.1996), citing *Anderson v. Creighton,* 483 U.S. 635, 638–39, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987). In determining whether a right was clearly established, we consider "(1) whether the right in question was defined with 'reasonable specificity,' (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question, and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful." *Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991), *cert. denied,* 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992).

It is clear that "FERPA creates an interest that may be vindicated in a section 1983 action." *Fay v. South Colonie Cent. Sch. Dist.,* 802 F.2d 21, 33 (2d Cir.1986).

Appellees rely on section 1232g(b) of FERPA, which directs the Secretary of Education to deny funds to an educational institution that "has a policy or practice of permitting the release of education records (or personally identifiable information contained therein other than directory information as defined in paragraph (5) of subsection (a) of this section) of students without the written consent of their parents to any individual, agency, or organization." 20 U.S.C. § 1232g(b)(1) (1990).

Appellants claim that releasing the list did not violate appellees' FERPA rights because (1) FERPA's emergency exception authorized release of the list, (2) releasing the list on a single occasion was not a "policy or practice" and was therefore permissible under FERPA, and (3) the information released was not protected by FERPA because it was "directory information" and was contained in a "law enforcement" rather than an "education" record. In addition, appellants claim qualified immunity on the ground that even if release of the list under these circumstances did violate appellees' FERPA rights, those rights were not clearly established at the time of the incident. Because we agree with appellants' contention that it was unclear whether FERPA's emergency exception allowed release of the list, we find that they

are entitled to qualified immunity on that ground. Accordingly, we do not reach their other arguments.

■ The statute, as it read in 1992, made no specific direction whether an educational institution might release information from students' education records to police to aid them in their search for a violent criminal who might be on campus. It provided in general terms that an educational institution may release protected information

(I) subject to regulations of the Secretary, in connection with an emergency, [to] appropriate persons if the knowledge of such information is necessary to protect the health or safety of the student or other persons....

20 U.S.C. § 1232g(b)(1)(I) (1990).

It is not clear that the situation Hartmark and Wilson faced was outside of that provision's terms. The situation could be considered an "emergency," which is defined as "an unforeseen combination of circumstances or the resulting state that calls for immediate action." Webster's Third New International Dictionary of the English Language 741 (unabridged ed. 1981). The attack and police investigation were not expected or foreseen. The assailant's escape might threaten the safety of those on campus as well as those in Oneonta, and the police were requesting immediate assistance.

The regulations referred to in the statute do not alter our opinion (which the district court shared) that it is "unclear that the situation did not constitute an emergency." (R. at 345.) In 1992, 34 C.F.R. § 99.31 provided:

**Under what conditions is prior consent not required to disclose information?**

(a) An educational agency or institution may disclose personally identifiable information from an education record of a student without the consent required by § 99.30 if the disclosure meets one or more of the following conditions:

...

(10) The disclosure is in connection with a health or safety emergency, under the conditions described in § 99.36.

34 C.F.R. § 99.36 provided:

**What conditions apply to disclosure of information in health and safety emergencies?**

(a) An educational agency or institution may disclose personally identifiable information from an education record to appropriate parties in connection with an emergency if knowledge of the information is necessary to protect the health or safety of the student or other individuals.

(b) Paragraph (a) of this section shall be strictly construed.

Those regulations merely repeat the words of the emergency exception. The instruction that it "shall be strictly construed" does not narrow the definition; it merely confines the exception to its terms.

Section 99.36 does not define "emergency" any more narrowly because the Secretary of Education decided not to do so. Before 1988, section 99.36 had set forth four criteria for determining whether the "emergency exception" applied:

(b)(1) The seriousness of the threat to the health or safety of the student or other individuals;

(2) The need for the information to meet the emergency;

(3) Whether the parties to whom the information is disclosed are in a position to deal with the emergency; and

(4) The extent to which time is of the essence in dealing with the emergency.

34 C.F.R. § 99.36 (1986). In 1988, the Secretary of Education deleted those criteria from the regulation and adopted the regulation quoted above. *See* Final Regulations, Family Educational Rights and Privacy, 53 Fed. Reg. 11942 (1988). The Secretary explained, in part, that he:

... based his decision to remove the nonstatutory criteria from the regulations on his belief that educational agencies and institutions are capable of making those

determinations without the need for Federal regulation.

*Id.* at 11957.

That left some discretion to educational institutions in deciding when the emergency exception should apply, and supports the conclusion that the regulations do not narrow its scope.

█ At the time of the events at issue there were no adjudications that made the scope of the emergency exception clear. While a right may be clearly established even if the very action in question has not previously been held unlawful, *Anderson v. Creighton,* 483 U.S. at 640, 107 S.Ct. at 3039, "in the light of preexisting law the unlawfulness must be apparent." *Id.* Nothing made apparent that preparation and release of the list was unlawful under the emergency exception.

Thus, it was not clear in 1992 whether the emergency exception permitted SUCO to release the list, and plaintiffs had no clearly established rights under FERPA that were violated by its release. The function of qualified immunity is to shield from suit those public officials who must make such decisions where, as here, the law is not clear, and no "clearly established right" is infringed.

█ In addition, Hartmark and Wilson have qualified immunity because "it was objectively reasonable for them to believe their acts did not violate" appellees' FERPA rights. *Weyant v. Okst,* 101 F.3d at 857. The objective reasonableness of their acts depends in part on what information they had at the time. *Cf. Anderson,* 483 U.S. at 641, 107 S.Ct. at 3040 ("[T]he determination whether it was objectively legally reasonable to conclude that a given search was supported by probable cause or exigent circumstances will often require examination of the information possessed by the searching officials."). From the evidence before the district court, it is clear that Wilson and Hartmark were aware of the attack, the suspect with the knife, and the police investigation. In addition, the director of SUCO's public safety office had reported that the assailant's trail had led to the edge of the campus, and that the police had specifically requested a

list of black male students. That information suggested that the assailant might be on the campus, and that the police believed a list of black male students was necessary to address that threat. In light of that information, it was objectively reasonable for them to determine that the situation they faced was within FERPA's emergency exception.

### 2. FERPA-conspiracy claims

The second amended complaint alleges that the defendants involved in the creation, release, and use of the list conspired to violate plaintiffs' FERPA rights in violation of 42 U.S.C. §§ 1983 & 1985(3), and failed to prevent the conspiracy in violation of 42 U.S.C. § 1986. The aim of the conspiracy, according to the complaint, was to create, release, and use the list in violation of FERPA. The § 1983 claim alleges that various defendants "conspired to generate, obtain and utilize the list to aid in the wrongful approaches, questioning, seizing and/or searching of the SUCO students listed, all in violation of FERPA." The § 1985(3) claim is essentially the same: it alleges that various defendants conspired to "create, disseminate and utilize a list of all male African–American students at SUCO."

■ That alleged conspiracy could not have violated plaintiffs' clearly established rights, because they had no clearly established rights under FERPA not to have the list created, released, and used. Nor can they allege, more generally, that appellants' intent was to violate FERPA. Such an allegation would be too vague to satisfy the requirements for pleading conspiracy claims. *See Sommer v. Dixon,* 709 F.2d 173, 175 (2d Cir.) ("A complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a *motion to dismiss."), cert. denied,* 464 U.S. 857, 104 S.Ct. 177, 78 L.Ed.2d 158 (1983).

■ Qualified immunity therefore protects the appellants who are alleged to have conspired to create, release, and use the list in violation of sections 1983 and 1985(3). Those conspiracy claims should have been dismissed, as well as the § 1986 claim that appellants failed to prevent the § 1985(3)

conspiracy, because "a § 1986 claim must be predicated upon a valid § 1985 claim." *Mian v. Donaldson, Lufkin & Jenrette Securities Corp.,* 7 F.3d 1085, 1088 (2d Cir.1993).

### II. Fourth Amendment Claims

Defendants-appellants John Donadio, William Davis, and Carl Shedlock of the City of Oneonta Police Department ("the Oneonta police officers") argue that the district court should have granted them summary judgment, based on qualified immunity, dismissing the Fourth Amendment claims asserted against them by three plaintiffs: Laurence Plaskett, Ronald Jennings, and Vincent Quinones, who assert that their rights were violated during the "sweep" of Oneonta.

As to the claims asserted by Plaskett and Jennings, we believe these appellants have misread the record, and that the district court in fact granted them summary judgment dismissing those claims. Judge McAvoy stated that "summary judgment in favor of the individual SUCO Public Safety Officers, Oneonta Police Officers, and State Police Officers should be granted on the Fourth Amendment claims under § 1983 as to each plaintiff, with the exception of plaintiffs Ronald Jennings, Vincent Quinones, and Laurence Plaskett, to the extent set forth herein." (R. at 767–68.) But with respect to Jennings and Plaskett the "extent set forth" denied summary judgment only to the "State Police defendants." (R. at 766, 767.) He therefore appears to have granted summary judgment dismissing Jennings and Plaskett's claims against all the other defendants, including the appellant Oneonta police officers, and there is no order denying qualified immunity for them to appeal.

We do not address whether appellants have qualified immunity from the claims asserted against them by Quinones. The district court did not rule on appellants' defense of qualified immunity with respect to Quinones's claims. It treated their motion for "dismissal and/or summary judgment" as a motion to dismiss those claims, and denied it, finding that the claims were adequately pleaded, (R. at 786–87), as is clear from its statement that it "determined that the plain-

tiff Quinones had set forth a claim sufficient to defeat a motion to dismiss pursuant to Fed.R.Civ.Proc. 12(b)(6)." (R. at 791.)

As is our practice in this Circuit when a district court fails to address the qualified immunity defense, we remand for such a ruling, *Eng v. Coughlin,* 858 F.2d 889, 895 (2d Cir.1988), to give the district court the first opportunity to rule on the qualified immunity defense with respect to Quinones's claims.

## CONCLUSION

We reverse the district court's orders to the extent they denied appellants qualified immunity from the claims that they violated FERPA, conspired to violate FERPA, and failed to prevent that conspiracy. We dismiss the appeals by John Donadio, William Davis, and Carl Shedlock asserting qualified immunity from the Fourth Amendment claims asserted by Ronald Jennings and Laurence Plaskett, and remand to the district court for a ruling on their defense of qualified immunity from Vincent Quinones's Fourth Amendment claims.