Timothy **KRAFT**, Plaintiff,

v.

The **CITY OF NEW YORK**
et al., Defendants.

No. 07 Civ. 02978(DC).

United States District Court,
S.D. New York.

March 18, 2010.

Opinion Denying Reconsideration
April 21, 2010.

Rose M. Weber, Esq., New York, NY, for Plaintiff.

Michael A. Cardozo, Esq., Corporation Counsel of the City of New York, by Elizabeth A. Wells, Esq., Assistant Corporation Counsel, New York, NY, for City of New York Defendants.

Hoey, King, Toker & Epstein, by Glen H. Parker, Esq., Danielle M. Dandrige, Esq., New York, NY, Attorneys for Common Ground Community Defendants.

Lester, Schwab, Katz & Dwyer LLP, by Thomas A. Catalano, Esq., New York, NY, Attorneys for Center for the Urban Community Services Defendants.

## OPINION

CHIN, District Judge.

On May 18, 2006, plaintiff Timothy Kraft was transported by members of the New York City Police Department (the "NYPD") and the New York City Fire Department (the "FDNY") to Bellevue Hospital following two different incidents with a tenant and staff at his apartment building. Doctors at Bellevue Hospital kept plaintiff overnight for observation and later admitted him over his objection to the psychiatric ward, where he remained until his discharge on May 23, 2006.

In this case, Kraft sues the City of New York (the "City"); Police Officers Brett Bara and Jose Bueno (the "police defendants"); the New York City Health and Hospitals Corporation ("HHC"); Dr. Eli Greenberg, Dr. Fadi Haddad, and Dr. Alyson Maloy (the "doctor defendants"); Amy Cohen; an unnamed emergency medical services ("EMS") supervisor; Common Ground Community H.D.F.C., Inc. ("CGC"), Oretha Franklin, Michael Giordano, Rosanne Haggerty, and Nancy Porcaro (collectively the "CGC defendants"); and the Center for Urban Community Services ("CUCS"), Stacy Neri, and Dawn Bradford (collectively the "CUCS defendants") for damages arising out of his purportedly wrongful transport and admission to Bellevue Hospital. He asserts claims under 42 U.S.C. § 1983 and state law.

Defendants move for summary judgment dismissing all claims pursuant to Federal Rule of Civil Procedure 56. For the reasons that follow, defendants' motions are granted, and the complaint is dismissed.

## BACKGROUND

### A. The Facts

On a motion for summary judgment, the Court construes the evidence in the light most favorable to the non-moving party. The following facts are drawn from the exhibits, declarations, and deposition transcripts submitted by the parties. Conflicts in the evidence have been resolved in plaintiff's favor.

Plaintiff resided at the Prince George, a CGC-operated residential building in Manhattan. (Pl. Dep. 5:1–5; Haggerty Dep. 23:10–18). CGC is a non-profit entity that

owns and manages several residential properties for use in assisting the homeless. (Dandrige Decl. Ex. B at 1). CUCS is a non-profit social services organization that assists chronically homeless individuals, and it provides such assistance to residents at the Prince George. (*Id.*).

On May 18, 2006, plaintiff was involved in an incident with another tenant, Thomas Hansen, a wheelchair-bound individual who plaintiff saw get out of his wheelchair on many prior occasions. (Pl. Dep. 10–11). Plaintiff was walking out of the Prince George when Hansen (in his wheelchair) approached him and made insulting and threatening remarks. (*Id.* at 10:23–25, 14:1–12). Plaintiff "told him to go to hell" and continued walking up the block. (*Id.* at 15:7–8). Hansen pulled up along side plaintiff, stood up from his wheelchair, and hit plaintiff in the face. (*Id.* at 15:14–18). After plaintiff attempted to punch Hansen several times, he turned around and walked away. (*Id.* at 17:19–23). Oretha Franklin, a member of the security staff at the Prince George, witnessed plaintiff attempting to punch Hansen (*id.* at 94:7–95:7; Franklin Dep. 9–10, 31:13–32:19) and notified her supervisor, Michael Giordano, CGC's assistant director of building operations including security (Giordano Dep. 7:11–15, 8:23–9:3, 76; Weber Decl. Ex. M at NYC 0005).

Later that day, between 4:15 p.m. and 4:30 p.m., plaintiff exited the building, and Hansen, who was outside, started to threaten him again. (Pl. Dep. 89:9–14). Plaintiff approached Hansen, but Giordano stepped between the two men, telling plaintiff he could not hit Hansen. (*Id.* at 89:13–16, 104:1–3). Plaintiff tried to explain that Hansen had punched him in the face earlier. (*Id.* at 104:3–4). At that point, Giordano pushed plaintiff. (*Id.*).[1] Plaintiff again tried to explain the earlier

incident, and Giordano said he did not care and pushed plaintiff again. (*Id.* at 104:4–5). Giordano proceeded to push plaintiff a third time, at which point, plaintiff pushed him back. (*Id.* at 90:1–7). Plaintiff then kicked Hansen's wheelchair and told him to get out of the chair, calling him a "phoney bastard." (*Id.* at 102:21–22). He then walked back into the building. (*Id.* at 102:23–25).

At that point, Dawn Bradford, a CUCS employee who had witnessed the incident, directed Franklin to call 911. (Bradford–Watt Dep. 4, 86–87). Giordano, Bradford, and Franklin informed Stacey Neri, a CUCS social worker, about the incidents involving plaintiff. (Neri Decl. ¶¶ 5, 10–13). After conferring with Bradford, Neri concluded that plaintiff should be evaluated at Bellevue's Comprehensive Psychiatric Emergency Program ("CPEP") and called 911 again to follow-up. (*Id.* at ¶¶ 15–16).

Police Officers Brett Bara and Jose Bueno of the NYPD arrived at the Prince George and gathered information from Neri, Giordano, Hansen, and plaintiff. (Pl. Dep. 137–40; Bara Dep. 29–30). Plaintiff overheard Neri tell the officers that plaintiff had beat up a man in a wheelchair unprovoked. (Pl. Dep. 125:14–22). Neri further informed them that plaintiff "had become verbally abusive to her" and "was not in the right state of mind at that point." (Bueno Dep. 27:25–28:7). The officers took formal complaints from both Hansen and plaintiff. (Wells Decl. Ex. M at NYC 0266–73). When the officers asked plaintiff to describe what happened, plaintiff raised his voice and spoke loudly, prompting the officers to tell him to calm down. (Pl. Dep. 140:10–12, 141:10–11, 142:9–10). Officer Bueno explained to plaintiff that EMS had been called and

---

1. Giordano denies pushing plaintiff (*see* Giordano Dep. 94:10–14), but for the purposes of this motion I assume plaintiff's version is true.

that he would have to wait for EMS to arrive and evaluate him. (Bueno Dep. 30:9–19). Plaintiff maintains that the officers told him to "go to the corner and stay there and don't move." (Pl. Dep. 127:19–20). Plaintiff did so. (*Id.* at 147:11–18; 148:23–49:4).

EMS arrived at approximately 5:14 p.m. (Dandrige Decl. Ex. O at NYC 0060). Two EMS workers spoke with the officers, Neri, and plaintiff. (Pl. Dep. 155–57). Neri showed plaintiff's file to the EMS workers. (*Id.* at 156:21–23). After some discussion, the EMS workers radioed for their supervisor to come to the Prince George. (*Id.* at 164:24–65:22). The supervisor arrived approximately ten to fifteen minutes later and spoke with the EMS workers, Neri, and the officers. (*Id.* at 165:23–25, 166:19–67:5). He then pointed east and said "let them over there decide." (*Id.* at 167:7–14). Plaintiff then walked to the ambulance on his own. (*Id.* at 168:10–69:4; Bara Dep. 44:20–22). The ambulance transported plaintiff to Bellevue Hospital where EMS escorted plaintiff inside to the admission desk. (Pl. Dep. 170:6–10, 175:1–11). Officers Bara and Bueno followed the ambulance to Bellevue, but did not enter the hospital. (*Id.* at 170:9–10, 176:8–9).

Dr. Greenberg was the attending psychiatrist in the psychiatric emergency room at Bellevue Hospital on the evening of May 18, 2006, and spoke with the EMS workers who transported plaintiff. (Greenberg Decl. ¶¶ 5–6). An unidentified medical student first interviewed plaintiff. (Maloy Dep. 59:22–60:3). The medical student spoke with Neri who informed her that plaintiff had punched a man in a wheelchair unprovoked and that plaintiff had been paranoid and irritable and was following staff members around the building. (Maloy Decl. ¶ 8; Wells Decl. Ex. N at NYC 0051). The medical student also spoke with plaintiff's neighbor, Cleo Capers, who stated that plaintiff had been more agitated over the past two years and had expressed having trouble with the staff in the building. (Wells Decl. Ex. N at NYC 0051). The neighbor, however, had never witnessed plaintiff start any trouble. (*Id.*).

Dr. Maloy then interviewed plaintiff together with the medical student. (Maloy Decl. ¶ 7). The interview lasted between fifteen and forty-five minutes. (Maloy Dep. 55:2–6). According to Dr. Maloy, plaintiff became very angry while describing what had happened that day. (Maloy Decl. ¶ 10). Dr. Maloy requested more references from plaintiff, explaining that because he only interacted with his neighbor occasionally, she felt more references were needed. (Pl. Dep. 186:25–88:4). Plaintiff refused to provide her with any-more references. (*Id.* at 187:16–20).

After interviewing plaintiff, Dr. Maloy determined the global assessment of plaintiff's functioning to be at a "thirty-five" out of "one-hundred." [2] (Maloy Decl. ¶ 11). She also found his affect to be "grandiose." (Maloy Dep. 55:16–18). She determined that plaintiff demonstrated poor judgment in the incidents involving Hansen and Giordano and that this judgment combined with his grandiosity could be a sign of hypomania or mania, a potentially dangerous condition if untreated. (Maloy Decl. ¶ 12). She concluded that plaintiff's symptoms interfered with his ability to engage in the community in a safe way. (*Id.* at ¶ 11). Dr. Maloy then presented plaintiff's case to Dr. Greenberg. (*Id.* at ¶ 11). At the time, Dr. Maloy was "leaning towards"

2. A "one" is considered unable to function, and a "one-hundred" is considered complete-ly functional. (Maloy Decl. ¶ 11).

recommending that plaintiff be kept for further observation. (*Id.* at ¶ 12).

Dr. Greenberg then interviewed plaintiff. (Greenberg Decl. ¶ 7). Based on his direct observations of plaintiff, Dr. Maloy's presentation, his own review of plaintiff's medical chart, the information from collateral sources, and his conversation with the EMS workers, Dr. Greenberg concluded that plaintiff exhibited poor judgment and potentially aggressive and violent verbal and physical behavior. (*Id.* at ¶¶ 8–9). Dr. Greenberg determined that plaintiff should be held for further observation under New York Mental Hygiene Law ("M.H.L.") § 9.40. (*Id.* at ¶ 10).

Dr. Maloy certified on the M.H.L. § 9.40 form that she examined plaintiff and determined that he might have a mental illness requiring immediate observation, care, and treatment in the CPEP at Bellevue Hospital. (Maloy Decl. ¶ 14; Wells Decl. Ex. N at NYC 0104). She further certified that, if untreated, plaintiff's illness would likely result in serious harm to himself or others. (Maloy Decl. ¶ 14; Wells Decl. Ex. N at NYC 0104). Dr. Maloy met with plaintiff a second time and informed him that he was being held for further observation for up to seventy-two hours. (Maloy Decl. ¶ 15). She provided plaintiff with a copy of a Notice of Status and Rights of CPEP Emergency Admission. (*Id.*). According to Dr. Maloy, at this point, plaintiff became very angry, stood up from his chair, came within inches of her face, and invaded her personal space. (*Id.* at ¶ 16). Plaintiff was not violent nor did he attempt to hit Dr. Maloy. (Maloy Dep. 47:8–11; Wells Decl. Ex. N at NYC 0055). Plaintiff denies standing up from his chair, raising his voice, or coming close to Dr. Maloy. (Kraft Decl. ¶¶ 4–5).

Plaintiff spent the night of May 18th sleeping intermittently in the waiting room. (Pl. Dep. 188:5–13). He awoke around 7:00 or 8:00 a.m. the next morning (*id.* at 188:22–23) and later met with Amy Cohen, a psychology intern. (*Id.* at 192:20–22; Wells Decl. Ex. N at NYC 0065–66). Cohen interviewed plaintiff, who recounted the prior incidents at the Prince George. (Wells Decl. Ex. N at NYC 0066). Cohen also spoke with Neri who informed her that plaintiff had demonstrated a recent change in mental status, becoming increasingly agitated the previous day. (*Id.*). Neri also told Cohen about the two incidents at the Prince George. (*Id.*). After interviewing plaintiff, Cohen presented plaintiff's case to Dr. Fadi Haddad, the attending psychiatrist in the psychiatric emergency room of the CPEP on May 19, 2006. (Haddad Decl. ¶¶ 7–8). Dr. Haddad then spoke to a collateral source, Dr. Jack Jurich, plaintiff's outpatient therapist. (*Id.* at ¶ 10). Dr. Jurich informed him that plaintiff had a history of impulse control and a paranoid personality disorder. (*Id.*). Dr. Haddad reviewed plaintiff's medical chart, including Dr. Maloy's report of plaintiff's confrontation with her. (*Id.* at ¶ 11). He concluded that plaintiff's reported behavior with Dr. Maloy showed poor impulse control, and that plaintiff displayed paranoid behavior. (*Id.*).

Dr. Haddad and Cohen then met with plaintiff approximately two to three hours after Cohen's initial interview. (Pl. Dep. 199–200). The meeting lasted fifteen to twenty minutes. (*Id.* at 200:7–8). Dr. Haddad informed plaintiff that he wanted to keep him in the hospital for a longer period of time. (*Id.* at 200–01). He then certified that he had examined plaintiff and had reasonable cause to believe that plaintiff had a mental illness requiring immediate observation, care, and treatment in a mental hospital under M.H.L. § 9.39. (Haddad Decl. ¶ 12; Wells Decl. Ex. N at NYC 0101). He further certified that if plaintiff remained untreated, the condition would likely result in serious harm to him-

self or others. (Haddad Decl. ¶ 12; Wells Decl. Ex. N at NYC 0101). Plaintiff received notification of his M.H.L. § 9.39 status. (Haddad Decl. ¶ 15).

Plaintiff spent the night of May 19th again sleeping intermittently in the waiting room.[3] (Pl. Dep. 207:5–14). He awoke the next morning, was given breakfast, and was later admitted to the psychiatric ward. (*Id.* at 207–08). That morning, Dr. Richard Nadrich confirmed Dr. Haddad's determination under M.H.L. § 9.39. (Haddad Decl. ¶ 13; Wells Decl. Ex. N at NYC 0068, 0102). Plaintiff, however, recalls seeing no doctors on May 20th. (Pl. Dep. 215:16–18).

Plaintiff met with Dr. Terrance Leingang on Monday, May 22, 2006. (*Id.* at 225:8–18). Dr. Leingang interviewed plaintiff with an intern and a social worker present. (*Id.* at 225:12–24). The interview lasted approximately forty to forty-five minutes. (*Id.* at 229:1–3). Dr. Leingang diagnosed plaintiff with psychothymic disorder, a mild form of manic depressive disorder, and personality disorder with obsessional, paranoid, and narcissistic trends. (Leingang Dep. 47:19–23; Wells Decl. Ex. N at NYC 0248). He concluded that plaintiff was not bipolar, but "clearly had problems." (Leingang Dep. 58:22–59:3). Dr. Leingang determined that plaintiff's primary condition was his obsessional disorder, which could be treated outside of the hospital, though he concluded that doctors could have made the decision to medicate plaintiff over plaintiff's objection. (*Id.* at 59:5–13). Dr. Leingang decided that plaintiff should continue therapy with Dr. Jurich after his discharge and subsequently referred him back to Dr. Jurich. (Wells Decl. Ex. N at NYC 0249). Plaintiff was discharged from Bellevue

Hospital on Tuesday, May 23, 2006. (*Id.* at NYC 0245).

### B. *Prior Proceedings*

Plaintiff filed the complaint in this action on April 13, 2007. The complaint asserts four claims against all defendants under 42 U.S.C. § 1983 for substantive due process violations, procedural due process violations, false arrest, and malicious abuse of process. It also asserts a municipal liability claim against the City and the HHC pursuant to *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The complaint also alleges eight additional state law claims against all defendants for false arrest, false imprisonment, malicious abuse of process, intentional infliction of emotional distress, negligent infliction of emotional distress, prima facie tort, negligent hiring and retention, and negligent training and supervision. Various cross claims were then filed among defendants, none of which are the subject of the motions before the Court. On August 29, 2008, on consent of the parties, the Court entered an order dismissing plaintiff's claims against Amy Cohen without prejudice. On May 7, 2009, on stipulation of the parties, the Court entered an order dismissing with prejudice the following claims: (1) plaintiff's federal claims against all CGC and CUCS defendants; (2) plaintiff's procedural due process claims against the individual City police defendants; and (3) plaintiff's state and federal malicious abuse of process claims against the individual City police defendants

The parties completed discovery. These motions followed.

---

**3.** It is unclear from the exhibits provided whether "waiting room" is synonymous with "intake room." (*See* Pl. Dep. 208:13–15).

## DISCUSSION

### A. Applicable Law

#### 1. Summary Judgment Standard

The standards governing motions for summary judgment are well-settled. A court may grant summary judgment only where there is no genuine issue of material fact and the moving party is therefore entitled to judgment as a matter of law. *See* Fed R. Civ. P. 56(c); *accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Summary judgment should be denied "if the evidence is such that a reasonable jury could return a verdict" in favor of the non-moving party. *See NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 178–79 (2d Cir.2008). In deciding a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in the non-moving party's favor. *In re "Agent Orange" Prod. Liab. Litig.*, 517 F.3d 76, 87 (2d Cir.2008). The non-moving party cannot, however, "escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture." *W. World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir.1990) (internal citations and quotation marks omitted).

#### 2. Section 1983

Section 1983 imposes civil liability on any party who, "under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983; *see also Williams v. N.Y. City Hous. Auth. & Local 237, I.B.T.*, No. 05 Civ. 2750(DC), 2007 WL 4215876, at *4, 2007 U.S. Dist. LEXIS 91134, at **12–13 (S.D.N.Y. Nov. 30, 2007), *aff'd*, 335 Fed.Appx. 108 (2d Cir.2009). To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must show that (1) defendants acted under "color of state law" (2) to deprive him of a right, privilege, or immunity guaranteed by the Constitution or laws of the United States. *Pitchell v. Callan*, 13 F.3d 545, 547–48 (2d Cir.1994); *see also Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999).

### B. Federal Claims Against the Doctor Defendants

#### 1. Substantive Due Process

Plaintiff alleges that the City doctor defendants violated his right to substantive due process under the Fourteenth Amendment by involuntarily committing him to Bellevue Hospital. He contends that the doctor defendants' diagnoses and determinations under M.H.L. §§ 9.40 and 9.39 were incorrect and that they were based upon either false factual allegations about plaintiff or facts unsupportive of such determinations and diagnoses.

##### a. Applicable Law

■ The Second Circuit has recognized that "[a]n involuntary civil commitment is a 'massive curtailment of liberty.'" *Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d Cir.1995) (quoting *Vitek v. Jones*, 445 U.S. 480, 491, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980)). Therefore, "[a]s a substantive matter, due process does not permit the involuntary hospitalization of a person who is not a danger either to herself or to others." *Id.* (citing *O'Connor v. Donaldson*, 422 U.S. 563, 575, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975)). Due process does not, however, "require a guarantee that a physician's assessment of the likelihood of serious harm be correct." *Id.* at 1062. The Second Circuit has instructed

that "a doctor will not be liable under § 1983 for the treatment decisions she makes unless such decisions are 'such a substantial departure from accepted judgment, practice, or standards as to demonstrate that [she] actually did not base the decision on such a judgment.'" *Kulak v. City of New York*, 88 F.3d 63, 75 (2d Cir.1996) (alteration in original) (quoting *Youngberg v. Romeo*, 457 U.S. 307, 323, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982)).

A doctor's decision to commit someone involuntarily under the M.H.L. "does not ordinarily involve matters 'within the layman's realm of knowledge.'" *Olivier v. Robert L. Yeager Mental Health Ctr.*, 398 F.3d 183, 190 (2d Cir.2005) (quoting *Sitts v. United States*, 811 F.2d 736, 740 (2d Cir.1987)). The decision is "'based on medical 'impressions' drawn from subjective analysis and filtered through the experience of the diagnostician.'" *Id.* (quoting *Addington v. Texas*, 441 U.S. 418, 430, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979)). Whether it violates a person's right to substantive due process "'turns on the *meaning* of the facts which [typically] must be interpreted by expert psychiatrists and psychologists.'" *Id.* at 191 (emphasis and alteration in original) (quoting *Addington*, 441 U.S. at 429, 99 S.Ct. 1804).

"The plaintiff bears the burden of producing competent evidence, typically in the form of expert testimony, regarding applicable medical standards and the defendants' alleged failure to meet those standards." *Fisk v. Letterman*, 501 F.Supp.2d 505, 522 (S.D.N.Y.2007) (citing *Olivier*, 398 F.3d at 190–91; *Drozdik v. City of New York*, No. 01 Civ. 3300(RCC)(GWG), 2003 WL 366639 (S.D.N.Y. Feb. 20, 2003)). In the absence of such evidence, summary judgment is appropriate. *See Kulak*, 88 F.3d at 75 (affirming summary judgment where plaintiff's expert disagreed with defendants' diagnosis of plaintiff, but failed to assert "that it was substantially below accepted professional judgment"); *Fisk*, 501 F.Supp.2d at 524; *Algarin v. N.Y. City Dep't of Corr.*, 460 F.Supp.2d 469, 477 (S.D.N.Y.2006), *aff'd* 267 Fed.Appx. 24 (2d Cir.2008); *see also Olivier*, 398 F.3d at 191.

### b. *Application*

■ Construing the evidence in the light most favorable to plaintiff, I conclude that a reasonable jury could not find that the doctor defendants' determinations and actions, even if incorrect, constituted a substantial departure from accepted judgment, practice, or standards.

In support of his claim, plaintiff offers the expert testimony and report of Dr. Mirjana Blokar, a board-certified, licensed psychiatrist. (Wells Decl. Ex. K at 1; Blokar Dep.). Dr. Blokar, however, fails to conclude anywhere in her report or deposition that the doctor defendants' diagnoses, actions, and subsequent determinations under M.H.L. §§ 9.40 and 9.39 fell substantially below accepted medical standards. Excerpts from her deposition testimony provided by the City and plaintiff largely consist of questions and disagreements about the doctor defendants' perceptions, diagnoses, and subsequent actions. (*See* Blokar Dep. 46:18–47:10, 60:9–15, 60:19–25, 61:8–12, 94:15–16). Such statements are not sufficient to raise material issues regarding the treatment decisions made by the doctor defendants. *See Kulak*, 88 F.3d at 75 (finding that expert's disagreement with diagnosis made by defendant doctors failed to raise material issue regarding their treatment decisions and did not constitute determination by expert that defendant doctors' diagnosis fell substantially below accepted professional judgment). Although Dr. Blokar, in one instance, deems a doctor's note in the medical records "unprofessional" (Blokar Dep. 60:13–15), she does not identify any standards from which it departs. Further, critiquing the note's form is not equivalent

to critiquing the physician's determination, which is the relevant inquiry before this Court. In fact, the only reference Dr. Blokar makes in either her report or her deposition to any sort of medical standard is when she explains in her deposition that to be involuntarily hospitalized, one has to be deemed imminently dangerous to himself or others. (*Id.* 98:2–17). She fails, however, to assert that the doctor defendants' determination that plaintiff was imminently dangerous substantially departed from accepted judgment, practice, or standards.

To the extent that Dr. Blokar determined from her own examination of plaintiff that he exhibited no symptoms indicative of a dangerous mental illness requiring psychiatric hospitalization (Wells Decl. Ex. K at 2–3), such a finding is insufficient to meet the substantial departure standard under *Kulak*. Dr. Blokar met with plaintiff on one occasion in March of 2009, nearly three years after plaintiff's involuntary confinement at Bellevue Hospital in May of 2006. (*Id.* at 1). The fact that plaintiff appeared healthy in 2009 with no sign of any dangerous mental condition has little bearing on what the doctor defendants may have perceived three years earlier. Notably, Dr. Blokar even qualifies one of her findings in this regard. (*Id.* at 3 ("Mr. Kraft does not suffer a dangerous mental illness and he does not require treatment with psychotropic medications *at this time*.") (emphasis added)).

Dr. Blokar's report and testimony also ignore the fact that five different doctors and two medical and psychology interns examined plaintiff over the course of his five-day confinement at Bellevue Hospital. (Greenberg Decl. ¶¶ 7–10; Haddad Decl. ¶¶ 8–9, 11–14; Leingang Dep. 58–59; Maloy Decl. ¶¶ 8–14). Six of those seven

individuals were involved in the initial decisions to retain and later admit plaintiff. (Greenberg Decl. ¶¶ 7–10; Haddad Decl. ¶¶ 8–9, 11–14; Maloy Decl. ¶¶ 8–14). The four doctors involved all concluded that plaintiff may have had a mental illness that would likely result in serious harm to himself or others if left untreated. (Greenberg Decl. ¶¶ 7–10; Haddad Decl. ¶¶ 8–9, 11–14; Maloy Decl. ¶¶ 9–14; Wells Decl. Ex. N at NYC 0068, 0102). These determinations were based on their own observations of plaintiff, their review of his medical records, and information elicited from him directly and other collateral sources. (Greenberg Decl. ¶¶ 6–9; Haddad Decl. ¶¶ 8–12; Maloy Decl. ¶¶ 7–10, 13; Wells Decl. Ex. N at NYC 0051, NYC 0055–57, NYC 0065–67).

Plaintiff's contention that the doctor defendants relied on disputed facts and false allegations—primarily, the information provided by Stacey Neri that plaintiff attacked a wheelchair-bound individual unprovoked and the claim by Dr. Maloy that plaintiff displayed threatening behavior upon learning that he was going to be held for further observation—is rejected. (Pl. Mem. 17–18, 20). First, each doctor defendant stated that no one factor was determinative in making his or her decision to retain or admit plaintiff, but rather, each relied on the total universe of information and observations collected—including their own interactions with plaintiff. (Greenberg Decl. ¶ 11; Haddad Decl. ¶ 14; Maloy Decl. ¶ 13). Second, even assuming that such allegations were false, there is no evidence that the doctor defendants should have known that to be the case or should have discredited the claim by Dr. Maloy, their own colleague, that plaintiff had invaded her personal space and made her fearful when she told him that he was going to be held for further observation.[4]

---

4. Although there is some conflict between plaintiff's and Dr. Maloy's account of how

Plaintiff's own expert even seems to suggest that because of plaintiff's alleged altercation with a wheelchair-bound individual, the doctor defendants were justified in keeping plaintiff for further observation. (Blokar Dep. 96:8–15) ("[I]f you just got that history that they just attacked somebody, you of course want to retain them and find out if they are dangerous."); *see also* (*id.* at 97:24–98:1); (Wells Decl. Ex. K at 3).

Because plaintiff fails to offer any evidence that the doctor defendants' diagnoses, actions, and subsequent determinations under M.H.L. §§ 9.40 and 9.39 fell substantially below accepted medical standards, no reasonable jury could conclude that they violated plaintiff's substantive due process rights under the Fourteenth Amendment.[5] The City's motion for summary judgment is therefore granted as to the substantive due process claim against the doctor defendants.

### 2. *False Arrest*

Plaintiff claims that the doctor defendants violated his Fourth Amendment rights by subjecting him to false and improper arrest while at Bellevue Hospital because plaintiff did not meet the criteria for involuntary hospitalization.

### a. *Applicable Law*

■ An involuntary confinement to a hospital constitutes a seizure within the meaning of the Fourth Amendment. *Glass v. Mayas,* 984 F.2d 55, 58 (2d Cir. 1993); *Drozdik,* 2003 WL 366639, at *5. Such an "infringement" is "tantamount to

the infringement of being arrested." *Glass,* 984 F.2d at 58 (internal citation omitted). "The Fourth Amendment requires that an involuntary hospitalization 'may be made only upon probable cause, that is, only if there are reasonable grounds for believing that the person seized is subject to seizure under the governing legal standard.'" *Id.* (quoting *Villanova v. Abrams,* 972 F.2d 792, 795 (7th Cir.1992)).

Pursuant to M.H.L. § 9.40, a comprehensive psychiatric emergency program can retain a person for a period of seventy-two hours when the individual is "alleged to have a mental illness for which immediate observation, care and treatment in such program is appropriate and which is likely to result in serious harm to the person or others." N.Y. Mental Hygiene Law ("M.H.L.") § 9.40(a) (McKinney 2009). Under M.H.L. § 9.39, a hospital can admit a person on that same basis and retain him for a period of fifteen days. *Id.* § 9.39(a). The M.H.L. requires that this finding be made before the individual is committed for an extended period of time. *Drozdik,* 2003 WL 366639, at *5 (citing M.H.L. § 9.39(a)).

### b. *Application*

■ Here, the doctor defendants had probable cause and reasonable grounds for believing that plaintiff was subject to seizure under the M.H.L. It is undisputed that the doctor defendants determined that plaintiff might have a mental illness that would likely result in serious harm to

---

plaintiff reacted, there is nothing to suggest that Dr. Maloy was lying. The medical records document the encounter and even candidly state that plaintiff "was not violent." (Wells Decl. Ex. N at NYC 0055).

5. Further, not only does Dr. Blokar fail to assert that the doctor defendants' determinations under M.H.L. §§ 9.40 and 9.39 fell sub-

stantially below accepted medical standards, she in fact implies in her report that the initial M.H.L. § 9.40 determination to hold plaintiff for up to seventy-two hours was justified. (Wells Decl. Ex. K at 3) ("staff at Bellevue did not have any justification for keeping Mr. Kraft involuntarily hospitalized *beyond the requisite 72 hours*") (emphasis added).

himself or others if left untreated. Based on this determination, they initially decided to hold him for further observation under M.H.L. § 9.40 and later admit him to the psychiatric ward under M.H.L. § 9.39. As discussed in Section B(1)(b), *supra,* their medical judgments were based on their own observations as well as information from collateral sources, some of which alleged violence and threatening behavior on the part of plaintiff. *See Drozdik,* 2003 WL 366639, at *5. Moreover, the fact that plaintiff's expert, Dr. Blokar, disagrees with those medical judgments is not enough to defeat summary judgment because she failed to conclude that the doctor defendants' determinations fell substantially below accepted medical standards. *See Kulak,* 88 F.3d at 75 ("[A] doctor will not be liable under § 1983 for the treatment decisions she makes unless such decisions are 'such a substantial departure from accepted judgment, practice, or standards as to demonstrate that [she] actually did not base the decision on such a judgment.'" (alteration in original) (quoting *Youngberg,* 457 U.S. at 323, 102 S.Ct. 2452)). Therefore, the City's motion for summary judgment is granted as to the false arrest claim against the doctor defendants.

### 3. *Malicious Abuse of Process*

Plaintiff accuses the doctor defendants of malicious abuse of process under § 1983.

#### a. *Applicable Law*

■ A defendant can be held liable for malicious abuse of process when he (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse [or] justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process.

*Savino v. City of New York,* 331 F.3d 63, 76 (2d Cir.2003) (internal citation and quotation marks omitted). The crux of a malicious abuse of process claim is the collateral objective element. To meet this element, a plaintiff must prove not that defendant acted with an improper motive, but rather an improper purpose. *Id.* at 77 (noting that to state a claim for abuse of criminal process, a plaintiff "must claim that [authorities] aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution"). For example, tampering with evidence is not considered abuse of process because the goal or purpose—convicting the defendant—is a legitimate use of process. *See Chamberlain v. Lishansky,* 970 F.Supp. 118, 122 (N.D.N.Y.1997). Fabricating assault charges to save one's job could be abuse of process, however, because "safeguarding one's own employment lies outside the legitimate goal of criminal process." *Hernandez v. Wells,* 01 Civ. 4376(MBM), 2003 WL 22771982, at *9, 2003 U.S. Dist. LEXIS 21146, at *27 (S.D.N.Y. Nov. 18, 2003).

#### b. *Application*

■ Plaintiff argues that he was confined at Bellevue Hospital "for the financial purpose of keeping psychiatric beds filled and [HHC] hospitals running in the black" and that the doctor defendants admitted him for Bellevue Hospital's "financial gain, thereby increasing their job security." (Pl. Mem. 26). Plaintiff states that he intends to introduce evidence at trial documenting this widespread practice by the HHC. (*Id.*). No evidence, however, has been offered as of yet and plaintiff's mere reliance on his conclusory allegations regarding the HHC's practices fails to "set out specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e)(2). The City's motion for summary judgment is therefore granted as to the malicious

abuse of process claim against the doctor defendants.

#### 4. *Procedural Due Process*

Plaintiff alleges that the City doctor defendants violated his right to due process before being deprived of a liberty interest because they failed to comply with the requirements of M.H.L. § 9.39.

#### a. *Applicable Law*

■ The Second Circuit has recognized that involuntary commitment to a mental hospital cannot be executed by the State without due process of law. *Project Release v. Prevost,* 722 F.2d 960, 971 (2d Cir.1983) (citing *O'Connor,* 422 U.S. at 580, 95 S.Ct. 2486 (Burger, C.J., concurring)). It has further held that New York's overall statutory scheme outlining the process for involuntary commitment under the M.H.L. meets the requirements of procedural due process. *Id.* at 971. Where each of the relevant provisions of the M.H.L. have been followed, there is no procedural due process violation. *See Fisk,* 501 F.Supp.2d at 525–26.

#### b. *Application*

Here, the doctor defendants complied with each of the relevant provisions of the statute. Indeed, plaintiff does not allege that any of the named doctor defendants violated the M.H.L. Rather, plaintiff claims that a Dr. Nadrich, who is not a party to this action, falsified his medical records and the second M.H.L. § 9.39 certification in violation of the statute. (*See* Compl. 51; Pl. Mem. 25). Plaintiff asserts that this violated his due process, and that the HHC should be held vicariously liable for this violation. (*See* Compl. ¶ 51; Pl. Mem. 25).

Plaintiff's contention regarding Dr. Nadrich, however, does not change the undisputed fact that each of the named doctor defendants in this action complied with the relevant provisions of the M.H.L. Further, plaintiff's argument that the HHC can be held vicariously liable for Dr. Nadrich's procedural due process violations fails because a municipal defendant cannot be held vicariously liable under § 1983 on a *respondeat superior* theory. *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) ("[A] municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory.") (emphasis in original). The City's motion for summary judgment is therefore granted as to the procedural due process claim against the doctor defendants and the HHC.

#### 5. *Qualified Immunity as to Federal Claims Against the Doctor Defendants*

The doctor defendants also argue that they are entitled to qualified immunity. Because I am granting summary judgment as to their liability under § 1983 and dismissing the remaining state law claims against them, I do not reach the qualified immunity argument.

### C. *Federal Claims Against the Police Defendants*

#### 1. *False Arrest*

Plaintiff claims that the City police defendants violated his Fourth Amendment rights by subjecting him to false and improper arrest because they did not have probable cause to believe he had a mental illness and was a danger to himself or others. The police defendants contend that because they did not formally arrest plaintiff or do anything to restrain or affect his movement and because plaintiff voluntarily agreed to wait in the lobby of the Prince George for EMS to arrive, no arrest of plaintiff occurred. (City Mem.

15). They further assert that even if plaintiff could demonstrate arrest, the seizure would have been constitutionally permissible because they had probable cause to believe plaintiff was a danger to himself or others. (*Id.* at 15–16). Moreover, even if probable cause did not exist, the police defendants argue that they are entitled to qualified immunity. (*Id.* at 16–17).

The Court need not to determine whether as a matter of law the police defendants arrested plaintiff or had probable cause to arrest plaintiff. Even if the seizure did violate plaintiff's Fourth Amendment rights, the Court concludes that the police defendants are entitled to qualified immunity for their actions, and therefore, the City's motion for summary judgment is granted as to the false arrest claim against the police defendants. *See, e.g., Anthony,* 339 F.3d at 137 (declining to determine as a matter of law whether defendants had probable cause to arrest plaintiff, but affirming summary judgment because defendants were entitled to qualified immunity for their actions).

### a. *Applicable Law*

██ The elements necessary to state a claim for false arrest under § 1983 are the same as those necessary to state a claim for false arrest under New York law. *See Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996). To state a claim for false arrest under New York law, a plaintiff must show that (1) the defendant intentionally confined the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise justified. *See Posr v. Doherty,* 944 F.2d 91, 97 (2d Cir.1991).

██ Probable cause to arrest is a complete defense to an action for false arrest, even where a person is ultimately acquitted, because it constitutes justification. *See Weyant,* 101 F.3d at 852 (citing *Ber-*

*nard v. United States,* 25 F.3d 98, 102 (2d Cir.1994)); *see also Montalvo v. Jennings,* No. 93 Civ. 8351(KMW), 1996 WL 148483, at *2 (S.D.N.Y. Apr. 1, 1996). "A warrantless seizure for the purpose of involuntary hospitalization 'may be made only upon probable cause, that is, only if there are reasonable grounds for believing that the person seized' is dangerous to herself or to others." *Anthony,* 339 F.3d at 137 (quoting *Glass,* 984 F.2d at 58) (internal citation omitted).

The doctrine of qualified immunity shields police officers from personal liability for "official conduct that 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Ricciuti v. N.Y.C. Transit Auth.,* 124 F.3d 123, 127 (2d Cir.1997) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). An officer is therefore entitled to qualified immunity for false arrest if (1) it was objectively reasonable for the officer to believe that there was probable cause to make the arrest; or (2) if reasonably competent police officers could disagree as to whether there was probable cause to arrest. *See id.* at 128. In qualified immunity cases, the focus is not on the "correctness of the defendants' conduct, but rather the 'objective reasonableness' of their chosen course of action given the circumstances confronting them at the scene." *Lennon v. Miller,* 66 F.3d 416, 421 (2d Cir.1995).

██ Further, "[p]lausible instructions from a superior or fellow officer support qualified immunity where, viewed objectively in light of the surrounding circumstances, they could lead a reasonable officer to conclude that the necessary legal justification for his actions exists." *Anthony,* 339 F.3d at 138 (internal citations and quotation marks omitted).

■ "[A] defendant is entitled to summary judgment on qualified immunity grounds when 'no reasonable jury … could conclude that it was objectively unreasonable for the defendant[ ]' to believe that he was acting in a fashion that did not clearly violate an established federally protected right." *Lennon,* 66 F.3d at 420 (first and third alterations in original) (quoting *Robison v. Via,* 821 F.2d 913, 921 (2d Cir.1987)). An officer's actions are objectively reasonable if a reasonably competent officer would have acted the same way under similar circumstances. *See id.* at 420–21.

**b.** *Application*

■ Here, the actions of the police defendants were objectively reasonable. There is no dispute as to what they knew or observed, or what occurred while they were at the Prince George, notwithstanding whether plaintiff voluntarily agreed to wait for EMS.

Although plaintiff offers the unsupported allegation in his memorandum that "no one advised the police officers that plaintiff had caused or threatened serious physical harm" (Pl. Mem. 12), his own deposition testimony stated that he overheard Stacey Neri tell the police defendants that he "beat up a man in a wheelchair unprovoked." (Pl. Dep. 125:21–22). Neri confirmed this, explaining that she had "informed the police officers that there had been an incident in which Mr. Kraft had punched a tenant and had shoved our Security Director." (Neri Decl. 17). The police defendants also learned from Neri that plaintiff "had become verbally abusive to her" and "was not in the right state of mind at that point." (Bueno Dep. 27:25–28:7; Neri Decl. 17). Further, the police defendants took formal complaints from both Hansen and plaintiff. (Wells Decl. Ex. M at NYC 0266–73). Hansen accused plaintiff of being "verbally abusive," spitting on him, and attempting to punch him.

(*Id.* at NYC 0266; Bara Dep. 29:10–16). According to Officer Bara, Hansen appeared more calm than plaintiff who "began to scream and yell at the top of his lungs." (Bara Dep. 29:18–21). Though plaintiff denies this, he acknowledges that he was talking loudly (Pl. Dep. 142:9–11) and was "totally upset and livid" at the time. (*Id.* at 142:24–43:4).

Further, the police defendants were aware that the radio call to which they had originally responded had been changed to a call concerning an emotionally disturbed person ("EDP") and that EMS was en route to evaluate plaintiff. (Bueno Dep. 27:9–10, 28:23–25, 30:11–19). Officer Bueno explained in his deposition what typically happens once police get an EDP call:

> Once we get a call of an EDP, automatically EMS is going to show up. EMS can make a decision right there and then, if they feel you don't need to go to the hospital, you go on your own way. And if you need to go to the hospital, they'll take you to the hospital. I'm not a doctor obviously.

(Bueno Dep. 30:9–19). Officer Bueno added that police officers do not make the ultimate decision whether someone is an EDP but that they do sometimes decide whether to get EMS involved if they think someone might be an EDP. (Bueno Dep. 48:15–24). Here, neither officer remembers calling EMS, but Officer Bueno testified that he believed "the social worker" (presumably Neri) did. (Bueno Dep. 27:8–17). Officer Bara also testified that he felt plaintiff appeared enough disturbed that a call for EMS was warranted. (Bara Dep. 42:6–9). When the EMS workers and their supervisor arrived, they spoke with the police defendants, and both officers were still present when the supervisor made the decision to transport plaintiff to Bellevue Hospital (Pl. Dep. 155:20–56:13, 166:19–67:11).

Consequently, based on these circumstances, reasonable officers in the defendants' position would have believed that they had probable cause to seize plaintiff. It is undisputed that the police defendants acted in accordance with the EMS supervisor's ultimate decision to transport plaintiff to Bellevue Hospital, a decision that they believed was not within their purview. Such a decision was akin to instructions or orders from a superior or fellow officer, which supports qualified immunity when such instructions or orders are "apparently valid." *See Anthony,* 339 F.3d at 138. Here, the EMS supervisor's decision was apparently valid in light of the two 911 calls, the change of the police radio call to an EDP, and the information provided to the police defendants and EMS personnel by Giordano, Hansen, and Neri. The police defendants reasonably could have concluded, given the EMS supervisor's decision, that probable cause existed to seize plaintiff, and therefore, they are entitled to qualified immunity. *See id.* (finding that because a sergeant's order to seize plaintiff for involuntary hospitalization was "an apparently valid order in light of the substance of the 911 call and all of the surrounding circumstances known to [the officers]," the officers reasonably could have concluded that probable cause existed to seize plaintiff and are thus entitled to qualified immunity). The City's motion for summary judgment is therefore granted as to the false arrest claim against the police defendants.

### 2. *Substantive Due Process*

Plaintiff asserted a substantive due process claim against the police defendants in his complaint. The Stipulation and Order of Dismissal dated May 7, 2009 specified that the parties agreed to the dismissal of "[p]laintiff's due process claims" against the police defendants (Stipulation and Order of Dismissal ii); however, in a parenthetical, it only cited plaintiff's fourth federal claim, which is his procedural due process claim. (*Id.*). In the City's Notice of Motion for Summary Judgment, the police defendants moved for summary judgment on all of plaintiff's claims (City Notice of Mot. for Summ. J.) but failed to assert any argument regarding substantive due process in their memoranda. For the reasons stated in Section C(1)(b), *supra,* and because no reasonable jury could find the police defendants liable for substantive due process violations against plaintiff, I dismiss, *sua sponte,* the substantive due process claim against the police defendants.

### D. *Monell Claims Against the Municipal Defendants*

Because I have concluded that no reasonable jury could find that the City doctor defendants violated any constitutional rights of plaintiff, his claim against the HHC under *Monell* is dismissed. *See Doe v. Smith,* 704 F.Supp. 1177, 1188 (S.D.N.Y.1988) ("[T]here can be no municipal liability where no constitutional violations are found to have occurred."); *Vassallo v. Lando,* 591 F.Supp.2d 172, 202 (E.D.N.Y.2008) (holding that "no *Monell* claim can lie" where a court finds no constitutional violation).

Plaintiff also alleges a *Monell* claim against the City based on the actions of the police defendants. A municipality cannot be held liable under § 1983 solely on a theory of *respondeat superior. Monell,* 436 U.S. at 691, 98 S.Ct. 2018. A municipality may, however, be liable under § 1983 when the alleged deprivation of constitutional rights is the result of action pursuant to an official municipal policy, *id.* at 690–91, 98 S.Ct. 2018, or the municipality exhibits deliberate indifference to the possibility of such a constitutional violation. *Vann v. City of New York,* 72 F.3d 1040, 1049 (2d Cir.1995). Plaintiff has not, how-

ever, produced any evidence showing that any of the alleged constitutional violations were a result of a City policy or the City's deliberate indifference. Although plaintiff lists other cases in which other plaintiffs have made similar allegations with respect to their involuntary hospitalizations (Compl. ¶ 58; Pl. Mem. 29 & n. 9), plaintiff alleges no facts and provides no evidence supporting a *Monell* claim. Plaintiff's claim that the municipal defendants' unconstitutional customs and policies may be "inferred" (Compl.¶ 58) from the list of cases fails to "set out specific facts showing a genuine issue for trial." Fed. R.Civ.P. 56(e)(2). The City's motion is therefore granted as to the *Monell* claim.

## E. *State Law Claims*

Plaintiff asserts eight state law claims against defendants for (1) false arrest, (2) false imprisonment, (3) malicious abuse of process,[6] (4) intentional infliction of emotional distress ("IIED"), (5) negligent infliction of emotional distress ("NIED"), (6) prima facie tort, (7) negligent hiring and retention, and (8) negligent training and supervision. These claims arise from the same core facts set forth above. Because I conclude that based on these facts a reasonable jury could only find that defendants' actions with respect to plaintiff's transport and admission to Bellevue Hospital were proper, defendants' motions for summary are granted as to the state law claims against them.[7]

6. Pursuant to the Stipulation and Order of Dismissal dated May 7, 2009, the malicious abuse of process claim against the police defendants was dismissed.

7. Because I dismiss plaintiff's state law claims on the merits, I do not reach the City's argument that dismissal with respect to certain defendants is appropriate based on plaintiff's alleged failure to file a proper and complete Notice of Claim under General Municipal Law § 50–e.

## 1. *False Arrest and False Imprisonment Claims* [8]

### a. *City Defendants*

Because I have already concluded that the doctor defendants had probable cause and reasonable grounds for believing plaintiff was subject to seizure under the M.H.L., *see supra* Section B(2)(b), and because reasonable officers in the police defendants' position would have believed that they had probable cause to seize plaintiff, *see supra* Section C(1)(b), plaintiff's state law claims for false arrest and false imprisonment against the doctor and police defendants also fail. The City's motion for summary judgment is therefore granted as to the state law claims for false arrest and false imprisonment against the doctor and police defendants.

### b. *CGC and CUCS Defendants*

 For a private defendant to be liable for false arrest or imprisonment in New York " '[t]he defendant must have affirmatively induced the officer to act, such as taking an active part in the arrest and procuring it to be made or showing active, officious and undue zeal to the point where the officer is not acting of his own volition.' " *Curley v. AMR Corp.,* 153 F.3d 5, 13–14 (2d Cir.1998) (quoting 59 N.Y. Jur.2d *False Imprisonment* § 37 (1987)). While "the plaintiff must prove that the defendant *intended* or *instigated* [his] confinement," *King v. Crossland Sav. Bank,*

8. "In New York, the tort of false arrest is synonymous with that of false imprisonment." *Posr,* 944 F.2d at 96 (citing *Jacques v. Sears, Roebuck & Co.,* 30 N.Y.2d 466, 473, 334 N.Y.S.2d 632, 285 N.E.2d 871 (1972)). As stated in Section C(1)(a), *supra,* the elements of false arrest under New York law are identical to those under § 1983.

111 F.3d 251, 257 (2d Cir.1997) (emphasis in original), " '[a] civilian complainant, by merely seeking police assistance or furnishing information to law enforcement authorities who are then free to exercise their own judgment as to whether an arrest should be made and criminal charges filed, will not be held liable for false arrest or malicious prosecution.' " *Carmellino v. N.Y. City Dep't of Educ.*, No. 03 Civ. 5942(PKC), 2006 WL 2583019, at *61 (S.D.N.Y. Sept. 6, 2006) (quoting *Levy v. Grandone*, 14 A.D.3d 660, 789 N.Y.S.2d 291, 293 (2d Dep't 2005)), *aff'd in part sub nom. Mauskopf v. Dist. 20 of N.Y. City Dep't of Educ.*, 299 Fed.Appx. 100 (2d Cir.2008) *and Papasmiris v. Dist. 20 of N.Y. City Dep't of Educ.*, 299 Fed.Appx. 97 (2d Cir.2008).

■ Here, plaintiff fails to offer sufficient evidence that his transport and admission to Bellevue Hospital had been induced by the CGC or CUCS defendants to the point where Officers Bara and Bueno, the EMS workers and their supervisor, or the doctors at Bellevue were not acting of their own volition. While CGC and CUCS defendants did call 911 and provide information that led to plaintiff's seizure, Officer Bara specifically testified that plaintiff appeared disturbed enough to him that *he felt* a call for EMS was warranted. (Bara Dep. 42:6–9) (emphasis added). Officer Bara further testified that plaintiff was yelling and screaming at the top of his lungs (*id.* at 29:18–21), and though plaintiff denies this, he admits that he was talking loudly (Pl. Dep. 142:9–11), was "totally upset and livid" (*id.* at 142:24–43:4), and Officers Bara and Bueno had to tell him to calm down. (*Id.* at 140:10–12, 141:10–11, 142:9–10). Further, doctors at Bellevue Hospital stated that they not only relied on information from collateral sources like Neri in deciding to keep and later admit plaintiff, but also on what they learned about plaintiff through their own observations and interactions with him. (Green-

berg Decl. ¶ 11; Haddad Decl. ¶ 14; Maloy Decl. ¶ 13).

Plaintiff's argument that CGC defendants Giordano and Franklin provided false information to police and EMS—specifically, that plaintiff pushed Giordano and was seen punching Hansen—and that Nancy Porcaro, another CGC employee, adopted such alleged falsities in her conversations with Neri and police (Pl. Mem. 13–15) is without merit. Plaintiff, himself, admits to pushing Giordano (Pl. Dep. 90:6–7) and attempting to punch Hansen several times. (*Id.* at 17:19–23). Whether plaintiffs' actions were described to police and EMS as "attempting to punch" or actually "punching" Hansen is immaterial. Further, plaintiff's contention that Franklin failed to note in her security report that she did not see the start of the altercation where Hansen was the alleged instigator and that she erroneously noted that Hansen was sitting in his wheelchair (and not standing up) at the time (Pl. Mem. 14–15) is similarly insignificant.

Plaintiff's asserts that CUCS defendants Bradford and Neri were instrumental in his hospitalization due to the fact that Neri provided information to doctors at Bradford's direction, Neri and Bradford failed to report that Giordano had pushed plaintiff three times before plaintiff pushed him back, and since both defendants were social workers, police officers and EMS workers gave "great weight" to their conclusion that plaintiff needed to be psychiatrically evaluated. (*Id.* at 17–18). Plaintiff's contention is without merit. The fact that Giordano pushed plaintiff first does not change the undisputed fact that plaintiff shoved a CGC employee who was attempting to intervene and separate plaintiff and Hansen. (Giordano Dep. 92:11–25, 99:13–20). Further, as stated above, doctors at Bellevue Hospital did not rely solely on information provided by Neri in de-

ciding to confine plaintiff. (See Greenberg Decl. ¶ 11; Haddad Decl. ¶ 14; Maloy Decl. ¶ 13). Finally, plaintiff offers no evidence that Bradford's or Neri's position with CUCS unduly influenced the judgment or decision of EMS or police to transport plaintiff to Bellevue Hospital.

Consequently, no reasonable jury could conclude that the actions of the CGC and CUCS defendants affirmatively induced plaintiff's seizure to the point where Officers Bara and Bueno, the EMS workers and their supervisor, or the doctors at Bellevue Hospital were not acting of their own volition in the hospitalization of plaintiff. The CGC and CUCS defendants' motions for summary judgment are therefore granted as to the state law claims for false arrest and false imprisonment.

### 2. Malicious Abuse of Process Claims [9]

#### a. Doctor Defendants

For the same reasons discussed in Section B(3)(b), supra, plaintiff's state law claim for malicious abuse of process against the doctor defendants also fails. The City's motion for summary judgment is therefore granted as to the state law claim for malicious abuse of process against the doctor defendants.

#### b. CGC and CUCS Defendants

■ Plaintiff argues that the CGC and CUCS defendants sought his confinement at Bellevue Hospital because they wanted to be "free of plaintiff at least for a while, and perhaps permanently." (Pl. Mem. 26–27). Even assuming that the CGC and CUCS defendants had an improper motive

in seeking plaintiff's confinement at Bellevue Hospital, the objective or purpose of their actions—removal of plaintiff from the premises for psychiatric evaluation and commitment—is not outside the legitimate ends of the legal process at issue here, which is arrest and involuntary hospitalization. The CGC and CUCS defendants' motions for summary judgment are therefore granted as to the state law claim for malicious abuse of process.[10]

### 3. IIED Claim

■ To prevail on a claim for IIED under New York law, plaintiff must prove the following four elements: (1) extreme and outrageous conduct; (2) intent to cause severe emotional distress; (3) a causal relationship between the conduct and the resulting injury; and (4) severe emotional distress. See Bender v. City of New York, 78 F.3d 787, 790 (2d Cir.1996); Howell v. N.Y. Post Co., 81 N.Y.2d 115, 121, 596 N.Y.S.2d 350, 612 N.E.2d 699 (1993). In analyzing an IIED claim, courts usually focus on the first element—whether the conduct was extreme or outrageous. See Stuto v. Fleishman, 164 F.3d 820, 827 (2d Cir.1999). Without "sufficiently outrageous" conduct, no claim for IIED can be established. Howell, 81 N.Y.2d at 122, 596 N.Y.S.2d 350, 612 N.E.2d 699 ("[T]he 'requirements of the rule are rigorous, and difficult to satisfy.'") (quoting W. Page Keeton et al., Prosser & Keeton on Torts § 12, at 60–61 (5th ed. 1984)).

■ Here, plaintiff has not produced evidence sufficient for a reasonable jury to

---

**9.** The elements of a malicious abuse of process claim under § 1983 outlined in Section B(3)(a), supra, are identical to those under New York law. See Cook v. Sheldon, 41 F.3d 73, 80 (2d Cir.1994) (internal citations omitted).

**10.** Because I dismiss plaintiff's malicious abuse of process claims on the merits, I do not reach the CGC and CUCS defendants' arguments that dismissal is appropriate because plaintiff supposedly did not plead or prove special damages with the requisite level of specificity.

conclude that defendants' actions were extreme and outrageous or that he suffered severe emotional distress. As previously discussed, plaintiff's expert failed to find that the doctor defendants' decision to confine plaintiff substantially departed from accepted judgment, practice, or standards and even implies that plaintiff's initial confinement under M.H.L. § 9.40 was justified. *See supra* Section B(1)(b) and note 5. Further, I have already concluded that reasonable officers in the police defendants' position would have believed that they had probable cause to seize plaintiff. *See supra* Section C(1)(b). Finally, in light of what the CGC and CUCS defendants observed at Prince George regarding the incidents involving plaintiff, their actions, as alleged by plaintiff, do not amount to the sort of extreme conduct necessary to support plaintiff's claim here. Defendants' motions for summary judgment are therefore granted as to the IIED claim.

### 4. *NIED Claim*

Under New York law, a cause of action for NIED under the "direct duty theory" [11] arises "if [the plaintiff] suffers an emotional injury from defendant's breach of a duty which unreasonably endangered her own physical safety," *Mortise v. United States*, 102 F.3d 693, 696 (2d Cir.1996) (citing *Kennedy v. McKesson Co.*, 58 N.Y.2d 500, 504, 462 N.Y.S.2d 421, 448 N.E.2d 1332 (1983); *Green v. Leibowitz*, 118 A.D.2d 756, 500 N.Y.S.2d 146, 148 (2d Dep't 1986)), or if the breach "causes the plaintiff to fear for his or her own safety." *Matthews v. Malkus*, 377 F.Supp.2d 350, 361 (S.D.N.Y.2005) (internal citations omitted). "The duty in such cases must be specific to the plaintiff, and

not some amorphous, free-floating duty to society." *Mortise*, 102 F.3d at 696 (citing *Johnson v. Jamaica Hosp.*, 62 N.Y.2d 523, 526–27, 478 N.Y.S.2d 838, 467 N.E.2d 502 (1984)). *See, e.g.*, *Hazan v. City of New York*, No. 98 Civ. 1716(LAP), 1999 WL 493352, at *5 (S.D.N.Y. July 12, 1999) ("Although the City [of New York] has a general duty to prevent its police force from inflicting unreasonable harm on society at large, this duty was not a special one owed specifically to the plaintiff.") (internal citations omitted); *Cucchi v. N.Y. City Off-Track Betting Corp.*, 818 F.Supp. 647, 656 (S.D.N.Y.1993) ("The termination of an employee does not give rise to a claim for negligent infliction of emotional distress because a corporation owes the same duties to all employees.") (internal citations omitted).

Here, plaintiff has provided no evidence of any *specific* duty owed to him by defendants, particularly the CGC and CUCS defendants and the police defendants. Plaintiff's complaint is void of any reference to such a duty (*see* Compl. 94–99), and plaintiff's assertion in his memorandum that "[t]here is no question that plaintiff can satisfy [the duty-owed] prong" (Pl. Mem. 39) is insufficient. Further, while the police defendants may owe a general duty to the public, they did not owe any specific duty to plaintiff. *See Hazan*, 1999 WL 493352, at *5. Moreover, for the same reasons and facts discussed in Section B, *supra*, I conclude that no reasonable jury could find that the doctor defendants breached their duty of care to plaintiff by admitting him to the psychiatric ward. Even assuming they did, plaintiff fails to offer sufficient evidence that such a breach unreasonably endangered his physical

---

**11.** In New York, a plaintiff may establish an NIED claim through either the "bystander theory" or the "direct duty theory." *Mortise*, 102 F.3d at 696. Though plaintiff fails to articulate which theory he is asserting, based on the facts here, plaintiff seems to be alleging his NIED claim under a direct duty theory.

safety or caused him to fear for his physical safety. Though plaintiff makes the bald assertion that he "was afraid for [his] physical safety" while at Bellevue (Kraft Decl. ¶ 6), he cites only two examples that fail to sufficiently support his claim. In the first, he describes a tall, muscular patient who was "very aggressive and threatening" towards one of the guards and who "frequently looked at [plaintiff] in a menacing manner." (*Id.* at ¶ 7). In the second, he alleges that when he refused to take his medication, a tall, muscular guard told him, " 'We can make you take it.' " (*Id.* at ¶ 8). These instances do not amount to unreasonable endangerment, and no reasonable jury could conclude that plaintiff legitimately feared for his safety. Defendants' motions for summary judgment are therefore granted as to the NIED claim.

### 5. *Prima Facie Tort, Negligent Hiring and Retention, and Negligent Training and Supervision Claims*

Plaintiff asserted additional state law claims for prima facie tort, negligent hiring and retention, and negligent training and supervision in his complaint. Defendants moved for summary judgment on these claims, devoting multiple pages in their memoranda to them. (City Mem. 23–25; CGC Mem. 13–16; CUCS Mem. 12–13). In his opposition, plaintiff does not address any of these claims, and they are therefore deemed abandoned. *See Di Giovanna v. Beth Isr. Med. Ctr.*, 651 F.Supp.2d 193, 208 & n. 108 (S.D.N.Y.2009) (citing cases for proposition that plaintiff's failure to respond to argument made in summary judgment brief constitutes abandonment of claim).

### F. *Claims Against the Unnamed EMS Supervisor*

In his complaint, plaintiff asserted all of the foregoing claims against an unnamed EMS supervisor. As of yet, plaintiff has failed to identify the EMS supervisor by name. The City did not move for summary judgment with respect to the claims against the EMS supervisor. For similar reasons stated above regarding the police and doctor defendants, and because no reasonable jury could find the EMS supervisor liable for his actions concerning plaintiff, I dismiss, *sua sponte,* all claims against the EMS supervisor.

### CONCLUSION

For the foregoing reasons, defendants' motions for summary judgment are granted and all claims against defendants are dismissed. The Clerk of the Court shall enter judgment dismissing the complaint, with prejudice.

SO ORDERED.

### MEMORANDUM DECISION

In an opinion dated March 18, 2010, I granted defendants' motions for summary judgment and dismissed plaintiff's complaint pursuant to Federal Rule of Civil Procedure 56. *Kraft v. City of New York,* No. 07 Civ. 2978(DC), 2010 WL 1009548 (S.D.N.Y. Mar. 18, 2010). Plaintiff moves for reconsideration. For the reasons set forth in the March 18 opinion, the motion for reconsideration is denied. I add the following:

Plaintiff contends that this Court's March 18 opinion "misconstrued legal precedent and therefore utilized a heightened legal standard that virtually no plaintiff could ever hope to meet" with respect to the false arrest and false imprisonment state law claims against the CGC and CUCS defendants. (Pl. 3/28/2010 Ltr. at 1). Plaintiff cites language that appears in two sentences of Section E(1)(b) of the March 18 opinion that concludes there was insufficient evidence that the Common Ground Community H.D.F.C., Inc. ("CGC") defendants and the Center for Urban Community Services (§ "CUCS")

defendants had induced the police and doctor defendants to act to a point where their actions were not of their "own volition." (*Id.*). He argues that "the 'not acting of their own volition' standard is extreme, only marginally supported by case law, and creates an impossible hurdle for plaintiff herein and plaintiffs in general." (*Id.*). Plaintiff also submitted two letters to the Court, independent of his counsel, in which he makes various factual assertions about defendants, the incident at the Prince George, and his confinement at Bellevue Hospital.

First, plaintiff ignores the bulk of this Court's discussion under Section E(1)(b) of the March 18 opinion regarding the applicable law for private defendant liability for false arrest and imprisonment in New York. There, I outline the various factors courts consider in determining whether such a claim has been established. *Kraft,* 2010 WL 1009548, at *15. My discussion encompassed more than whether arresting authorities must act of their "own volition" and included many of the same substantive points of law and cases that plaintiff cites in his March 28 letter. *See id.* (*See also* Pl. 3/28/2010 Ltr. at 2–3).

▉ Second, to the extent that plaintiff argues that the language regarding "own volition" is some sort of an "extreme" and "heightened legal standard" (Pl. 3/28/2010 Ltr. at 1), this argument is rejected. A private defendant cannot be liable for his active role in an arrest unless his role rises to a point where the arresting authorities are not exercising " 'their own judgment,' " but rather, are acting on the " 'advice and encouragement or importuning' " of the

defendant. *See Levy v. Grandone,* 14 A.D.3d 660, 789 N.Y.S.2d 291, 293 (2d Dep't 2005) (quoting *Mesiti v. Wegman,* 307 A.D.2d 339, 763 N.Y.S.2d 67, 69 (2d Dep't 2003)). Thus, in pages thirty-six through thirty-nine of the March 18 opinion, I discuss how the actions of the CGC and CUCS defendants did not rise to such a level because both the police and doctor defendants not only relied on the information provided by CGC and CUCS personnel, but also on their own observations of and interactions with plaintiff as well as their own judgment. *Kraft,* 2010 WL 1009548, at **16–17.

Third, plaintiff's contention that the "own volition" language is "poorly reasoned" and "only marginally supported by the case law" (Pl. 3/28/2010 Ltr. at 1–2) is without merit. The Second Circuit instructed in *Curley v. AMR Corp.* that for a private defendant to be liable for false arrest or imprisonment in New York " [t]he defendant must have affirmatively induced the officer to act, such as taking an active part in the arrest and procuring it to be made or showing active, officious and undue zeal to the point where the officer is not acting of his own volition.' " 153 F.3d 5, 13–14 (2d Cir.1998) (quoting 59 N.Y, Jur.2d *False Imprisonment* § 37 (1987)). Plaintiff cites to the Second Circuit's opinion in *Raysor v. Port Auth. of N.Y. & N.J.,* 768 F.2d 34, 39 (2d Cir.1985), for the argument that the "own volition" language is an overstatement of New York law. (Pl. 3/28/2010 Ltr. at 2).[1] *Raysor,* however, predates *Curley* and thus cannot be considered an abrogation of the "own

---

1. The Second Circuit in *Raysor* briefly addressed a New York court's holding that " 'a defendant in a false arrest action will not be held liable for police detention unless it is shown that the police are not acting on their own volition but rather were carrying out the express directions or demands of the defendant.' " 768 F.2d at 39 (internal citation omitted). The Second Circuit stated that "[w]hile this may be overstating the law of New York, it at least demonstrates that the courts are fully aware of the principle that for a third-party defendant or complainant to be liable for false arrest by the police there has to be an unequivocal complaint or request to arrest." *Id.*

volition" language. Indeed, numerous other courts in this Circuit and in New York rely on the "own volition" language (and often *Curley* ) when stating the law of false arrest in New York. *See, e.g., Morgan v. Nassau County,* No. 03 Civ 5109(SLT)(WDW), 2009 WL 2882823, at *16 (E.D.N.Y. Sept. 2, 2009); *Carmellino v. Dist. 20 of N.Y. City Dep't of Educ.,* No. 03 Civ. 5942(PKC), 2006 WL 2583019, at *61 (S.D.N.Y. Sept. 6, 2006), *aff'd in part sub nom. Mauskopf v. Dist. 20 of N.Y. City Dep't of Educ.,* 299 Fed.Appx. 100 (2d Cir.2008), *and Papasmiris v. Dist. 20 of N.Y. City Dep't of Educ.,* 299 Fed.Appx. 97 (2d Cir.2008); *Smith v. Reid,* No. 98 Civ 1429(SJ), 2004 WL 528437, at *8 (E.D.N.Y. Mar. 9, 2004); *Nevin v. Citibank, N.A.,* 107 F.Supp.2d 333, 348 (S.D.N.Y.2000); *Oszustowicz v. Admiral Ins. Brokerage Corp.,* 49 A.D.3d 515, 853 N.Y.S.2d 584, 586 (2d Dep't 2008); *Levy,* 789 N.Y.S.2d at 293; *Mesiti,* 763 N.Y.S.2d at 69 (2d Dep't 2003).

■ Fourth, plaintiff's claim that the CGC and CUCS defendants "encourag[ed] and importun[ed] the authorities to act, while also providing false and inflammatory information" (Pl. 3/28/2010 Ltr. at 2), fails. "When police independently act to arrest a suspect on information provided by a party, that party is not liable for false imprisonment—*even if the information provided is later found to be erroneous.*" *King v. Crossland Sav. Bank,* 111 F.3d 251, 257 (2d Cir.1997) (emphasis added) (internal citation omitted); *see also Levy,* 789 N.Y.S.2d at 293 (" '[A] civilian complainant, by merely seeking police assistance or furnishing information to law enforcement authorities who are then free to exercise their own judgment as to whether an arrest should be made and criminal charges filed, will not be held liable for false arrest or malicious prosecution.' " (quoting *Mesiti,* 763 N.Y.S.2d at 69)); *Du Chateau v. Metro–North Commuter R.R. Co.,* 253 A.D.2d 128, 688 N.Y.S.2d 12, 15

(1st Dep't 1999) (same). Here, the CGC and CUCS defendants' actions amounted to furnishing information to and seeking the assistance of authorities regarding an individual who might be a danger to himself or others if untreated. *See Kraft,* 2010 WL 1009548, at **16–17. As discussed in Section E(1)(b) of the March 18 opinion and above, the authorities exercised their own judgment and made the ultimate decision, based in part on information provided to them and their own observations, to transport plaintiff to Bellevue Hospital and keep him for further observation.

Fifth, though plaintiff asserts that there is a "lower threshold" for liability of a private defendant on a false arrest or imprisonment claim (Pl. 3/28/2010 Ltr. at 2)—"that the defendant *intended* or *instigated* the confinement of the plaintiff," *Crossland,* 111 F.3d at 257, or that there must be "a request that [plaintiff] be arrested or prosecuted," *Raysor,* 768 F.2d at 39,—the Second Circuit has characterized this as "the *minimal action* necessary to sustain a claim of false arrest or malicious prosecution," *id.* (emphasis added). Hence, despite CGC and CUCS defendants initially calling 911 for police and EMS, and Stacey Neri recommending that plaintiff be psychiatrically assessed, the CGC and CUCS defendants' subsequent actions "cannot be said to have risen to the level of directing or instigating an arrest" of plaintiff. *See Crossland,* 111 F.3d at 257.

■ Finally, plaintiff's two additional letters sent independent of his counsel do not change the result. "[A] motion to reconsider should not be granted where the moving party seeks solely to relitigate an issue already decided." *Shrader v. CSX Transp., Inc.,* 70 F.3d 255, 257 (2d Cir.1995). "[T]o be entitled to reconsideration, a movant must demonstrate that the

Court overlooked controlling decisions or factual matters that were put before it on the underlying motion, which, had they been considered 'might reasonably have altered the result reached by the court.' " *Keiser v. CDC Inv. Mgmt. Corp.*, No. 99 Civ. 12101(WHP), 2004 WL 516212, at *1 (S.D.N.Y. Mar. 17, 2004) (internal citation omitted).

Here, plaintiff's own submissions largely rearticulate previous assertions already considered and rejected by this Court. They also raise certain different factual allegations that, had they been considered, would not have altered the result reached in the March 18 opinion. In some instances, plaintiff even makes assertions that are contradictory to what he previously alleged. For example, plaintiff claims to have never spoken with Dr. Greenberg (Pl. 4/3/2010 Ltr. at 1), but plaintiff's response to the City defendants' statement of material facts admits to meeting Dr. Greenberg on the evening of May 18, 2006. (Pl. Resp. to City Def. Statement ¶ 31). In another instance, plaintiff states that Oretha Franklin recanted in her deposition that she saw plaintiff hitting Thomas Hansen, thus contradicting her security report. (Pl. 4/3/2010 Ltr. at 3). Franklin's deposition testimony is void of any such contradiction, however, and makes reference to plaintiff attempting to punch Hansen. (*See* Franklin Dep. 31:13–32:14). Whether Franklin described it as "punching" or "attempting to punch" or "throwing punches" is immaterial. *Kraft*, 2010 WL 1009548, at *16.

The parties briefed the summary judgment motion on the existing facts, including those in the depositions, declarations, exhibits, and statements of material facts. Plaintiff's own letters seek to relitigate issues not based on any newly acquired facts, but rather, facts that were apparently known at the time but were either (1) not raised by any of the parties or (2) already addressed in the March 18 opinion.

For the reasons set forth above and those in the March 18 opinion, the motion for reconsideration is HEREBY DENIED.

SO ORDERED.